State v. Smith.

THE STATE v. MINNIE EFFIE K. SMITH, Appellant.

Division Two, February 26, 1926.

1. **CHANGE OF VENUE:** Affidavit against All Counties of Circuit. Under the statute (Sec. 3973, R. S. 1919) as amended (Laws 1921, p. 206), upon the filing of an application for a change of venue, supported by the affidavits of five citizens of the county, alleging that the minds of the inhabitants of all the five counties in the circuit are so prejudiced against defendant that she cannot have a fair trial in any of them, the court may take evidence, and if the witnesses testify that they know nothing of prejudice against defendant in the other four counties the court may grant a change of venue to one of the four, and is not compelled to send the case to a county in another circuit.

2. **MURDER:** Accessory before Fact: Demurrer to Evidence. The sheriff had arrested defendant's paramour, charged with bank robbery, whom she was and had been harboring at her house. The robber was searched when arrested, but had no pistol on his person, but there was at that time a pistol belonging to him upstairs in defendant's house. The arrested robber wore high-top boots, but had sore feet and was not able to walk to the near-by village, where the sheriff had left his automobile. He sent his deputy for the car, directing him to meet him and the arrested robber at a road crossing, where was a water trough. After the deputy had gone, the defendant, of her own motion, although it was four o'clock in the morning, got her own car and hauled the sheriff and the robber to the meeting place. Defendant's car stopped at the water trough, and soon afterwards the sheriff was found dead. A bullet had entered the back of his head, and his hat had fallen into the trough as he, apparently, was stooping over in taking a drink, and the extracted bullet was of the same calibre as the robber's pistol, which was upstairs at the time of his arrest, and which defendant had opportunity to obtain before she drove her car to the meeting

place. After defendant was arrested she was heard to ask her daughter if she thought the robber would give it away on her. When the robber was again arrested he had concealed on his person not only his own pistol, but the sheriff's revolver. *Held*, evidence sufficient to sustain a verdict that defendant was accessory before the fact, and the demurrer to the evidence was rightly overruled.

3. ————: **Evidence: Threats:, Res Gestae.** Testimony that the defendant, charged as accessory before the fact to the murder of the sheriff an hour or two after he had arrested a bank robber at her house, at the time of the arrest abused the deputy sheriff, who was present and assisted in the arrest, and said to him that the crows would pick his bones before morning or before this is over, is competent as a part of the *res gestae*. Especially is it competent where, soon after making it, she manifested her real vindictiveness towards the deceased sheriff. And an instruction telling the jury not to consider such threats should not be given, though requested by the State.

4. ————: ————: **Statements against Interest: Comment.** An instruction telling the jury in a murder trial that "the defendant is entitled to what she said for herself if true, and the State is entitled to anything she might have said against herself in any statement proven by the State; what the defendant said against herself, if anything, the law presumes to be true, unless negatived by some other evidence in the cause, because said against herself," etc., is not erroneous as a comment on the evidence.

5. **ARGUMENT TO JURY: Belief: Reprimand.** It is improper for the prosecuting attorney to attempt to influence the jury by asserting his belief that the defendant is guilty; but where he said: "I believe the defendant was the one who passed the pistol to Ramsay and it is my belief that she is guilty," and the court, upon an objection and a request to rebuke counsel, said: "Yes, you cannot say what you believe, but you can say what the evidence is," there was no reversible error. The statement of the court plainly indicated to the jury that the prosecuting attorney had transcended the limit of legitimate argument, and the extent to which the court should go in administering a reprimand is largely within the discretion of the court.

6. ————: **Maximum Punishment: Disregarded.** The prosecuting attorney should not be rebuked for urging upon the jury the duty of inflicting the punishment provided by statute. And where defendant was being tried for murder a remark of the prosecuting attorney in his argument to the jury that in his opinion "a life sentence would not be commensurate with the crime this defendant has committed," to which an objection was sustained, certainly did

not prejudice defendant, where the jury plainly disregarded the remark by assessing her punishment at imprisonment for a term of twelve years.

.Criminal Law, 16 C. J., Section 115, p. 128, n. 66; Section 128, p. 135, n. 34; Section 306, p. 204, n. 59; Section 323, p. 217, n. 35, 41; Section 1116, p. 575, n. 63; p. 576, n. 73; Section 2257, p. 908, n. 40, 44; Section 2260, p. 910, n. 68; Section 2270, p. 916, n. 59 New; Section 2271, p. 917, n. 67; p. 919, n. 77; Section 2370, p. 972, n. 75; Section 2422, p. 1004, n. 37, 40; 17 C. J., Section 3638, p. 299, n. 29; Section 3729, p. 359, n. 64. Homicide, 29 C. J., Section 32, p. 1064, n. 69; Section 39, p. 1067, n. 93; 30 C. J., Section 587, p. 333, n. 47, 49 New; Section 640, p. 394, n. 5. Indictment and Information, 31 C. J., Section 247, p. 699, n. 7.

Appeal from Ozark Circuit Court.—*Hon. Fred Stewart,* Judge.

AFFIRMED.

*Page & Barrett* for appellant.

(1)   Defendant's application for a change of venue from Taney County, which also included Ozark, Christian and Stone counties, should have been sustained as to all of the counties named. Laws 1921, p. 206. The right to change of venue is statutory and it is competent for the General Assembly to prescribe the terms upon which it should be granted; and when these terms are met, the judge has no discretion to refuse it. State v. Witherspoon, 231 Mo. 706; State v. Spivey, 190 Mo. 87. A change of venue may be taken by the defendant from the judicial circuit in which the cause is pending. Sec. 3871, R. S. 1919.   (2) The defendant was not shown to have been connected in any way with the murder charged, either directly or indirectly, and her demurrer at the close of all of the evidence ought to have been sustained. In order to convict on circumstantial evidence alone, it must exclude every reasonable hypothesis consistent with the defendant's innocence; and the evidence must be sufficient to satisfy the jury beyond a reasonable doubt of the guilt of the defendant. State v. Carlisle, 57 Mo. 102; State v. Houser, 28 Mo. 237; State v. Moxey, 102 Mo. 388; State v. Woolard, 111 Mo. 255; State v. David, 131 Mo. 480. In order to sustain the theory that the defendant was an aider and

abettor, the evidence must go to prove that she was present when the crime was committed, that she understood that the crime would be attempted, and that she did some act in aiding the offender in the commission of the crime. State v. Orrick, 106 Mo. 11; State v. Dalton, 27 Mo. 13; State v. Miller, 67 Mo. 604; State v. Lee, 228 Mo. 480. (3) Instructions should not be given on theories of the case not authorized by the evidence. State v. McKinsey, 102 Mo. 620. The authority submitting a case on the theory that the defendant was an aider and abettor, the evidence must show that such defendant was present when the crime was committed; that he understood that the crime would be attempted, and that he did some act in aid of the principal offender, or that his presence gave encouragement. State v. Orrick, 106 Mo. 111; State v. Dalton, 27 Mo. 13; State v. Miller, 69 Mo. 604; State v. Lee, 223 Mo. 480. (4) It is a comment on the evidence, and an erroneous statement of the law to instruct the jury that statements made by the defendant are presumed to be true. Steele v. Railroad, 265 Mo. 97. Especially is this true where no cautionary instruction is given. State v. Sharpless, 212 Mo. 204; State v. Henderson, 186 Mo. 493. (5) Evidence of threats by the defendant, made against others than the deceased, are inadmissible. 30 C. J. 191 (26.)

*North T. Gentry,* Attorney-General, and *Wm. L. Vandeventer,* Assistant Attorney-General, for respondent.

(1) Under Sec. 3973, R. S. 1919, as amended, Laws 1921, p. 206, two compurgators are necessary. State v. Kocian, 208 S. W. 44; State v. Witherspoon, 231 Mo. 706; State v. Swisher, 186 Mo. 1; State v. Richardson, 194 Mo. 326; State v. Turlington, 102 Mo. 642; State v. Lannahan, 144 Mo. 31; State v. Headrick, 149 Mo. 396. And this was true where the prejudice of the judge alone was alleged. State v. Brownfield, 83 Mo. 448; State v. Neiderer, 94 Mo. 79. Before the amendment of 1921 the granting of a

change of venue because of local prejudice was within the sound discretion of the trial judge. State v. Anderson, 252 Mo. 83; State v. Shoffer, 253 Mo. 320; State v. Jackson, 227 S. W. 647. Affidavits were inadmissible to prove prejudice of inhabitants of county. State v. Bohanan, 76 Mo. 562. The petition supported by the two compurgators does not make a prima-facie case for change when prejudice of inhabitants is alleged. There must be proof. State v. Tatlow, 136 Mo. 678. The amendment of 1921 does not dispense with the two compurgators, but substitutes the affidavits of "five or more credible disinterested citizens residing in different neighborhoods of the county where said cause is pending," for the proof of prejudice. Sec. 3973, Laws 1921, p. 206. Where it is shown that affiants' knowledge is limited to small territory, and not to the whole area sworn against, it is not error to overrule application. Brown v. State, 203 S. W. 1031; Van Camp v. State, 125 Ark. 532; McCown v. State, 188 S. W. 547; Williams v. State, 103 Ark. 70. (2) The threat made by defendant against Layton was admissible to show her animus and intent at the time. It showed a malign purpose against anyone who assisted in the arrest of Ramsey who, from the endearing terms used by defendant, must have been her lover. State v. Kester, 201 S. W. 62; People v. Scott, 284 Ill. 465; Palmer v. State, 138 Ill. 356; State v. Nelson, 148 Minn. 285; State v. Canup, 180 N. C. 739; Brown v. State, 141 Ga. 5; Smith v. Comm., 29 Ky. L. 23. (3) Instruction 8 was proper. State v. Williams, 274 S. W. 436; State v. Hamilton, 304 Mo. 19; State v. Simenson, 263 Mo. 266; State v. McCleave, 256 S. W. 814; State v. Hays, 262 S. W. 1036. (4) The bodily presence of one at the scene of a crime is not necessary to hold him criminally responsible. State v. Kramer, 226 S. W. 643; State v. Mispagel, 207 Mo. 557; State v. Carr, 256 S. W. 1048; State v. Gatlin, 170 Mo. 354; State v. Roderman, 248 S. W. 964; 16 C. J. 134, sec. 125.

HIGBEE, C.—The defendant was found guilty of murder in the second degree, in the Circuit Court of

Ozark County, and sentenced to imprisonment in the penitentiary for a term of twelve years in accordance with the verdict of the jury, and appealed.

She was charged by information in the Circuit Court of Taney County with murder in the first degree, in that on the 12th day of August, 1924, she shot and killed N. D. Boles, who was at that time the sheriff of Taney County. A change of venue was awarded to Ozark County, where there were two trials. At the second trial, in May, 1925, she was found guilty as above stated. The facts are fairly and impartially stated by the Attorney-General as follows:

"The evidence on the part of the State tended to show that the Sheriff of Taney County, N. D. Boles, and his deputy, Ben Layton, were searching for one Robert Ramsey, who was wanted in connection with the robbery of the Bank of Protem. The sheriff and his deputy met at Branson on the 11th day of August, 1924, and from there went in a car to Kirbyville. Here they left the car and went to the residence of Mrs. Smith, the defendant. Arriving there at 'dusky dark' they went up the back way and at a distance saw defendant and Robert Ramsey. The officers were slipping up towards the house when the dogs began to bark, which fact seems to have prevented them going up and arresting the fugitive, Ramsey; they watched the house until about eleven o'clock, when Mrs. Walton drove up in a car and went into the house. The officers then went to the neighbors, by the name of Christian, and Mr. Christian and his two sons went back with them to the Smith house, arriving there at about midnight.

"The lights were still burning and the officers waited until the occupants of the building had extinguished the lights and gone to bed, which was about three o'clock in the morning, and then they surrounded the house. The sheriff, Mr. Boles, went to the front door, and Layton, with the aid of a flashlight, looked in at a window.

"Looking through the window he saw the young son of the defendant in bed, but saw no one else.

"The sheriff knocked at the door several times and finally the defendant answered him and the sheriff informed her he was looking for Robert Ramsey, but was informed by the defendant he was not there; for the sheriff to go look in the barn; he might be there.

"The sheriff, however, went in the house and brought the fugitive, Ramsey, down from upstairs. Ramsey was undressed save for a union suit, his other clothes being on the bed, and the sheriff searched these clothes before he handed them to Ramsey, who put them on. Ramsey was then taken out of doors and handcuffed. All this time, the defendant was abusing Layton and making threats toward him and telling him that the crows would pick his bones before morning, or, as some witnesses said, 'before this is over.'

"It appears that Ramsey had sore feet and was not able to walk to Kirbyville, some two miles distant, where the car had been left; so the sheriff sent Layton for the car, with instructions to meet him and Ramsey at the Gobbler Knob Schoolhouse, which was about a quarter or a half a mile away and to which Ramsey agreed to walk.

"When Layton last saw the sheriff, Ramsey was sitting down, Mr. Boles was leaning against the fence, and Mrs. Smith was on the inside of the fence. This was about four o'clock.

"Layton went to Kirbyville to get the car and returned shortly before daylight. He failed to meet Mr. Boles at the Gobbler Knob Schoolhouse, and he drove on down to the Smith home, but the lights were out and he failed to see anyone. Later he met Mrs. Smith going home.

"Layton then went on to Kirbyville and got his brother and while on this trip he learned that Mr. Boles had been hurt. He again met Mrs. Smith and asked her if she knew where Boles was and she said that she did not; that she had gotten her car out and picked up Boles and Ramsey and hauled them down the road about a mile and let them out at the mouth of the lane.

"The evidence showed that when Ramsey started away from the Smith house (he was) without a coat, and that the defendant got his coat and gave it to Mr. Boles, who searched it, and then Ramsey put it on.

"The sheriff also asked Ramsey where his gun was and he said it was upstairs. This statement was made in the presence of Mrs. Smith. However, no one went to get the gun. The mouth of the lane where the sheriff and Ramsey left the car of Mrs. Smith was on the road over which Layton would return from Kirbyville. The mouth of the lane is also referred to in the evidence as the 'mail boxes.'

"The evidence showed that the sheriff carried a 38 special Smith-Wesson revolver, and the deputy carried the same size revolver but an earlier model. When defendant was arrested at Hollister there were some old coats lying in the back seat of her car and the cushion was wet. After Ramsey had put on his coat, furnished by defendant at the Smith house, he and Mrs. Smith had a conversation behind the door, but what was said could not be heard by the State's witnesses.

"It was also shown in the evidence that the defendant offered to take Boles and Ramsey to Forsyth, but refused to take anyone alse, and that she also knew that the sheriff and Ramsey were going down to the Gobbler Knob Schoolhouse and wait for the return of Layton with the car.

"The morning following the arrest of Ramsey, one Frank Riley went to a watering trough on his farm, about five o'clock. This watering trough was located about one hundred yards from the lane, or mail boxes, where the sheriff and Ramsey left the car of the defendant. Riley had gone down there to prepare some feed for his cows, and found a hat in the trough. It was later identified as the hat of Sheriff Boles, and which had been pierced by a bullet from the rear. A flashlight was also in the trough and the holster of a revolver was lying east of the trough. It was a foggy morning and Riley did not find the body of the sheriff.

"Riley's wife took the hat, flashlight and holster over to a neighbor by the name of Wheeler. Wheeler and another man went in search of the body, and about forty or fifty feet from the watering trough they found the body of the deceased. The tracks and bloodstains indicated that he had been shot at the watering trough and had walked to the place where he was found.

"At the time Boles was found he was still breathing, but died shortly afterwards. The autopsy was held at Branson and it was discovered that Boles came to his death from the effects of a bullet which entered the back part of his head, ranging downward and to the left, hitting the inside front part of his skull. The nose of the deceased was also broken. The bullet was a steel jacket 32-caliber and the impact of hitting the skull had split it.

"On the 14th of August, Ramsey was arrested where he was hiding in a box car at Branson and on his person were found two revolvers, a 38 Smith-and-Wesson special and a 32 automatic, which was identified as one owned by him. The Smith-and-Wesson was identified as the revolver of the sheriff.

"At the time of defendant's trial, Ramsey already had been tried and sentenced to the penitentiary for life.

"Evidence was also introduced to show that Mrs. Smith possessed a, revolver which was seen in her home a short time prior to the killing. Mrs. Smith was arrested the morning after the homicide as was also her daughter, Mrs. Walton, sometimes referred to as 'Blondie.' Mrs. Walton operated a restaurant at Branson. Defendant and her daughter were placed in the jail at Forsyth, and when news came of the arrest of Ramsey at Branson, she was heard to ask 'Blondie' if she thought Bob (Ramsey) would give it away on her, or would give her away, and that 'Blondie' told the defendant she did not believe he would.

"The evidence on the part of the defendant was practically the same as that introduced on the part of the State, varying only in minor details, except that the de-

fendant positively declared she had nothing to do with, and knew nothing about, the killing of Newt. Boles, the sheriff.

"Defendant's evidence shows that after the arrest of Ramsey, she and her small son got their car and went to Branson, where they stayed until the following morning. When they left her house they overtook the sheriff and his prisoner and hauled them down to the forks of the road, referred to as the lane, or the mail boxes, and there left them and that she knew nothing about their movements after that time. That it was a very foggy morning.

"Her evidence showed also that she did not have a revolver and that there had been none at her place, except that of Ramsey, so far as she knew, for more than a year, when her husband had taken his revolver back to Clinton with him. The gun taken from Robert Ramsey at the time of his arrest was shown to have been his individual property and in his possession some time before the homicide.

"The defendant positively denied making the statement testified to relative to her conversations with 'Blondie' in the jail, that she did not know Ramsey had a gun on the night of the homicide and that she did not give him one.

"Defendant offered a demurrer at the close of the State's evidence and renewed it at the close of all the evidence."

The defendant filed an application for a change of venue, supported by the affidavits of five citizens of Taney County, alleging that the minds of the inhabitants of all the counties of the Thirty-first Judicial Circuit, consisting of Taney, Ozark, Christian, Douglas and Stone counties, were so prejudiced against her that she could not have a fair trial in said counties and she prayed a change of venue to some county where such prejudice did not exist. Over the objection and exception of the defendant, the court heard the oral testimony of several of the support-

ing witnesses, from which it appeared that all of the affiants lived in the western part of Taney County and that these who testified knew nothing of any prejudice against the defendant in the other counties of the judicial circuit. The court sustained the application for a change of venue from Taney County, but overruled it as to the other four counties. When the case reached Ozark County the defendant filed a plea to abate the action because the Circuit Court of Taney County erred in refusing to grant a change of venue to some county out of the Thirty-first Judicial Circuit, and that in consequence thereof the Circuit Court of Ozark County was without jurisdiction. This motion was overruled.

I. Section 3973, Revised Statutes 1919, as amended (Laws 1921, p. 206), provides that in counties having a population of less than 75,000 inhabitants, if the petition for change of venue shall be supported by the affidavits of five or more credible, disinterested citizens residing in different neighborhoods of the county where **Change of Venue.** the cause is pending, the court or judge in vacation *shall* grant the change of venue, and it is further provided that if the application shall allege prejudice of the inhabitants of more than one county in the circuit in which the case is pending, the court *may*, upon proof of the allegations, "as herein provided," order the case sent to some county in the same or some other circuit where such causes do not exist. It is apparent that the words "as herein provided," which are not a part of the amendment of 1921, refer to the first part of the section which provides that when the application is supported by the affidavits of two credible, disinterested citizens of the county, the truth of the allegations of the application shall be proved to the satisfaction of the court "by legal and competent evidence." In the present case it was shown hat several of the supporting witnesses had no knowledge of any prejudice against the defendant outside of Taney County. But, without considering the pro-

313 Mo. Sup.—6.

priety of the action of the court in hearing the evidence of the supporting witnesses, it is clear that, by the terms of the statute, even if proof of prejudice had been offered as to the inhabitants of the other counties of the circuit, the granting of the application for a change of venue to some other judicial circuit was a matter within the discretion of the court. There was no error in awarding the change of venue or in overruling the plea in abatement.

II. Appellant's learned counsel insist that the demurrer to the evidence should have been sustained. The outstanding facts and just inferences for the State are that about a year before the homicide, Mrs. Smith's husband returned to Clinton County, where they had formerly lived, to resume his trade. There is no suggestion that he thereafter visited the defendant. He abandoned her and was not at the trial. The day on which Ramsey was arrested was not the first time he had visited at Mrs. Smith's home. Miss Christian saw Ramsey there on Sunday before the date of the homicide. Mrs. Smith did not conceal her passion for him. When he got ready to leave Mrs. Smith accompanied him to the shed where he cranked his car. On the night on which the sheriff arrested Ramsey, Mrs. Smith told the sheriff that Ramsey was not in the house. She was evidently trying to conceal him in her house and prevent his arrest. Boles, however, found him upstairs, and when Ramsey was asked where his revolver was he said it was upstairs. No weapon was found on him. At this time he wore high-topped boots. As the sheriff was about to take Ramsey away, Mrs. Smith addressed him, saying: "Honey, I want to speak to you." They stepped behind the door out of the sheriff's sight. What she said was not heard. Mrs. Smith followed Boles and Ramsey into the yard and proposed to take them in her car to Forsyth, the county seat, but said she would not take the other trash, referring to Layton, the deputy sheriff, and other assistants. Boles, however, sent Layton to Kirbyville for his

*Demurrer to Evidence.*

car, where he had left it, and appointed a place of meeting at the end of the lane, called "the mail boxes," a mile or so distant, to which place Boles set off on foot with his prisoner. "Hell hath no fury like a woman scorned." Boles had arrested Mrs. Smith's paramour whom she was harboring. Although it was four o'clock in the morning, Mrs. Smith and her boy got her car, overtook Boles and Ramsey, took them in and let them out at the mail boxes. Ramsey did not have his revolver when he left Mrs. Smith's house, but when he was arrested a few days later at Branson he not only had on his person his 32 automatic revolver, identified as his by several witnesses, but he also had the 38 Smith-and-Wesson revolver that Boles had carried when he arrested Ramsey. Dr. Mitchell, the coroner who performed the autopsy on the body of the deceased, removed the upper part of the skull and found the bullet. He was familiar with firearms and said the bullet was one used in a 32 automatic revolver, and produced it at the trial. He testified that the bullet did not penetrate the most vital part of the brain; that it did not cut the motor tract; consequently Boles was not paralyzed; that Boles could have lived several hours and could have walked after he was shot. Dr. Mitchell was of the opinion, from the course of the bullet, that Boles was stooping as if to get a drink from the watering trough at the time he was shot, and that his hat fell into the trough.

It is clear that Mrs. Smith had a motive and that she alone had an opportunity to give Ramsey his revolver or to slip it into his boot top as he and Boles got out of her car at the mail boxes. From all the facts and circumstances in evidence, it seems clear beyond a reasonable doubt that Mrs. Smith gave Ramsey the revolver that he might kill Boles and effect his escape and that, while Boles was in the act of stooping to take a drink from the trough, Ramsey fired the fatal shot. Mrs. Smith was an accessory before the fact. If she did not give Ramsey the revolver, it is difficult to conceive why she asked her daughter, when they learned of Ramsey's arrest, if she

thought he, Ramsey, would tell on her or give her away. If she did not give him the revolver, what could he tell on her? How could he give her away ? A careful consideration of the record leads us to the conclusion that the court properly overruled the demurrer to the evidence and that it is sufficient to support the verdict of the jury.

III.   Appellant insists the court erred in admitting proof that, at the time the sheriff arrested Ramsey, Mrs. Smith abused Layton, the deputy sheriff, and told him the crows would pick his bones before morning, or, as one witness said, before this is over. This was a part of the *res gestae*. [State v. Parr, 296 Mo. 406, 246 S. W. 903, cited in State v. Joseph Witham, 281 S. W. 32, decided at this sitting of the court.]

Res Gestae: Threats.

Different inferences might have been drawn from this threat. Soon after making it, however, Mrs. Smith showed her real animus towards the sheriff. [See State v. Kester, 201 S. W. 62, 63 (3), and 13 R. C. L. 924.] She, no doubt, veiled her enmity against Boles that she might get an opportunity to hand the revolver to Ramsey. This she could not hope to do if Layton accompanied Boles and Ramsey.

IV.   The court instructed the jury upon murder in the first and second degrees, the presumption of innocence, the burden of proof, reasonable doubt, and that the jury were the judges of the weight and credibility of the evidence. In addition thereto, the court gave the following instructions:

"6.   Gentlemen, when two or more persons agree together with a common intent to do an unlawful act and said act is consummated, then the act of one is the act of all.

"7.   Gentlemen, if verbal statements of the defendant have been testified to in this case, they are to be received by you with great caution, on account of the liability of witnesses to forget or misunderstand what was really said or intended.

State v. Smith.

"8. If you believe and find from the evidence that the defendant made any statement or statements in relation to the offense charged in the information after such offense is alleged to have been committed, you must consider such statement or statements all together. The defendant is entitled to what she said for herself if true, and the State is entitled to anything she might have said against herself in any statement or statements proved by the State. What the defendant said against herself, if anything, the law presumes to be true, unless negatived by some other evidence in the cause, because said against herself. What the defendant said for herself the jury may believe or disbelieve as it is shown to be true or false by the evidence in this case. It is for the jury to consider, under all the facts and circumstances in evidence in this case, how much of the whole statement or statements of the defendant proved by the State, if any, the jury, from the evidence in the case, deem worthy of belief.

"9. In connection with the instruction herein, permitting a conviction of one who aids and abets in the commission of a crime, the court instructs the jury that although you may believe and find from the evidence that the defendant may have consented to or been willing that the deceased be killed, or that she was actually present at such killing, yet she would not be guilty of the crime charged, and before you can find the defendant guilty under said instruction it must have been proven to your satisfaction beyond a reasonable doubt that the defendant rendered some aid to the actual perpetration of the killing, and such aid must have been furnished with the criminal intent and for the purpose of committing murder.

"10. The court instructs the jury that although you may find and believe from the evidence that the defendant had Robert Ramsey, who was charged with bank robbery, at her home and that she may have denied to the officers the fact of his presence and may have attempted to prevent his arrest, yet such acts alone are not such as would make such person guilty of aiding and abetting the

crime of murder, but before the defendant can be so con-
victed the State must have proven to your satisfaction be-
yond a reasonable doubt that the defendant rendered some
aid with the intent and felonious purpose that such acts
would contribute to and assist in the actual killing of the
deceased.

"Gentlemen, the word feloniously means wickedly
and wrongfully and against the admonition of the law.

"11. The court instructs the jury that although
you may find and believe that the defendant made threats
against any individual other than that of the deceased,
yet such threats should not be considered by you in arriv-
ing at your verdict.

"12. The court instructs the jury that before one
can become guilty of aiding in the commission of a crime,
it must be shown that the person so aiding therein had
knowledge of the intention of the principal to commit the
crime charged."

Instruction 8 is not a comment on the evidence, as is
claimed by the appellant. It was approved in State v.
Glazebrook, 242 S. W. 928 (14). Other criticisms of the
instructions are without merit. They were favorable to
the defendant and fully instructed the jury upon all ques-
tions of law arising in the case. Instruction 11 should not
have been given, as it was too favorable to the defendant.

V. In the closing argument to the jury, the prosecut-
ing attorney said: "I believe that the defendant was
the one who passed the pistol to Ramsey and it is my be-

Argument to Jury.

lief that she is guilty." An objection
to this remark was sustained. The
court being asked to rebuke counsel for the improper
remark, said: "Yes, you cannot say what you believe,
but you can say what the evidence is." Counsel for the
defendant excepted to the failure of the court properly to
reprimand the prosecuting attorney.

It is the province of the prosecuting attorney, in his
argument to the jury, to sum up the evidence pointing to
the guilt of the accused, but it is improper for him to at-

tempt to influence the jury by asserting his belief that the accused is guilty. [State v. Cole, 252 S. W. 701 (3); State v. Reppley, 213 S. W. 477, 480, and cases cited.] We have reversed convictions for inflammatory remarks of the prosecuting attorney in his argument to the jury. [See State v. Connor, 252 S. W. 713, 720.] In the instant case the court promptly sustained the objection and, in effect, admonished counsel that he could discuss the evidence, but not express his belief. This plainly indicated to the jury that in the opinion of the court the prosecuting attorney had transcended the limits of legitimate argument. The extent to which the court should go in administering a reprimand in such a case is largely within the discretion of the court.

In State v. Hart, 292 Mo. 74, 96, 237 S. W. 473, Judge WHITE said: "A reprimand by the trial court in such case should be for the purpose of counteracting the prejudicial effects of objectionable remarks. It is likely to be injurious to the party reprimanded, and should not be such as to go further than that, nor to give advantage to the side objecting. The court, in this instance, by peremptorily ordering the prosecutor to keep within the record and directing the objectionable remarks to be stricken out, doubtless thought the reprimand was sufficient to neturalize the bad effects of the remarks. We are not prepared to say that the court incorrectly determined that question. The incident was not sufficient to require a discharge of the jury, a matter largely within the discretion of a trial court. [See State v. Bersch, 276 Mo. 397, 424, 207 S. W. 809.]"

Another criticism is that the prosecuting attorney in his closing argument, said: "It is my opinion that a life sentence would not be commensurate with the crime that this defendant had committed." An objection to this remark also was promptly sustained. Thereupon defendant's counsel said: "We object and except to the action of the court in refusing to reprimand counsel for the State."

In a capital case we cannot see that the prosecuting attorney should be rebuked for urging upon a jury the duty of inflicting the punishment provided by the statute. But the jury disregarded the plea of the prosecutor and acquitted the defendant of the capital charge; she was not prejudiced by the remarks complained of.

A careful consideration of the record has failed to disclose any error prejudicial to the defendant. The judgment, therefore, is affirmed. *Railey, C.,* concurs.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.