THE STATE v. PETE CAROLLA, Appellant.

Division Two, December 20, 1926.

1. JUVENILE OFFENDER: Under Seventeen Years of Age: Act of 1923: Application. The Juvenile Act of 1923, Laws 1923, page 153, pertaining to juvenile courts in counties having more than fifty thousand inhabitants and raising the age of juvenile offenders to eighteen years, did not become effective until June 25, 1923, and consequently had no application to a crime committed on May 4, 1923, but as to said crime Section 2591, Revised Statutes 1919, was in force, and it applied to children under seventeen years of age; and where the defendant, by his own showing, was over seventeen years of age on May 4, 1923, he had no right to compel the transfer of his case from the criminal division of the Circuit Court of Jackson County to the juvenile court.

2. ————: Under Eighteen Years of Age: Plea to Jurisdiction: Conclusive Finding. The finding of the circuit court, upon a plea to its jurisdiction and upon a motion to transfer to the juvenile court, that the defendant was over seventeen years of age at the time of the robbery for which he was indicted, is conclusive on appeal, being a finding of fact upon conflicting evidence.

3. GRAND JURY: Manner of Selection. A motion to quash the indictment on the ground that the grand jury returning it was not selected in the manner prescribed by statute should be overruled, and will not be considered on appeal where the record recites that a grand jury of twelve men was duly impaneled and summoned according to law, sworn and charged. A challenge to the array of grand jurors should be made before they are sworn.

4. INSTRUCTION: Witness: Impeachment: Written Statements: Admission as Substantive Evidence. An instruction telling the jury that written statements of a recalcitrant witness for defendant are admitted for the purpose only of impeachment, and are not to be considered as proof of the matters and facts contained in them "except as to such facts, if any, as you may find were admitted to be true by said witness in his testimony in this case," does not erroneously make such statements substantive evidence against the defendant, where the witness in his testimony

had corroborated the prosecuting witness in every detail of the robbery except that pertaining to the identification of the defendant, and although denying in his testimony that he had ever seen defendant, in said sworn prior written statement, which he testified was voluntary and true, and which had been read to the jury by the State, he stated he knew him, identified his voice in subsequent conversations, had been offered money not to identify him and threatened with violence if he did.

5. **EVIDENCE: Opinion: Identification.** Provided the witness bases his testimony on his own knowledge, and not on information furnished by another, his opinion, belief, judgment or impression as to the identity of the defendant is competent. Prior written and sworn statement by an ordinary witness that "to the best of my knowledge the defendant was about the size and general description of one of the bandits" and "as near as I can possibly tell from his voice and general description, the defendant was the one that came out to my house that night at midnight and talked to me" were not mere matters of opinion, but competent as a basis for impeaching the witness where he testified that he did not identify the defendant.

6. **INSTRUCTION: Robbery: Feloniously.** The word "feloniously" is a word of classification, and not of definition, and need not be used in an instruction covering a case of robbery. An instruction telling the jury that if they find defendant took and carried away any money or property described in the indictment from the person of the man robbed, or in his presence and against his will, by force and violence to his person, and by putting him in fear of immediate injury to his person, without any honest claim to such property, and with the intent to deprive him of his ownership therein, "they will find him guilty of robbery in the first degree," includes every element of the crime, as defined by the statute, and is not erroneous, though it does not use the word "feloniously" and does not expressly require the taking to have been unlawful and with a felonious intent.

7. ———: ———: **Duplicitous: From Person and in Presence.** An instruction in a robbery case requiring the jury to find that defendant took and carried away money or property of the man robbed "from his person or in his presence and against his will, by force and violence to his person by putting him in fear of immediate injury to his person," should have used the word "and" instead of "or" in the phrase "from his person or in his presence," and also the word "and" before "by putting him in fear." But it is not duplicitous, or erroneous where the charge is that defendant took "the money and personal property . . . from the person and against the will," since the charge of taking from the person is satisfied by proof that the money or property was taken in the presence of the person robbed.

Corpus Juris-Cyc. References: **Criminal Law,** 16 C. J., Section 1537, p. 750, n. 82, 83, 84; Section 1572, p. 767, n. 87; Section 2426, p. 1005, n. 54; Section 2441, p. 1016, n. 85; Section 2466, p. 1031, n. 84; Section 2506, p. 1063, n. 85; 17 C. J., Section 3558, p. 211, n. 12; Section 3559, p. 212, n. 18. **Indictments and Informations,** 31 C. J., Section 380, p. 804, n. 24, 25. **Infants,** 31 C. J., Section 224, p. 1100, n. 18 New. **Robbery,** 34 Cyc., p. 1810, n. 90. **Witnesses,** 40 Cyc., p. 2687, n. 93; p. 2742, n. 37.

Appeal from Jackson Circuit Court.—*Hon. Charles R. Pence,* Judge.

AFFIRMED.

*Rader & Rader, Paul S. Conwell* and *Jos. S. Brooks* for appellant.

(1) Instruction 4 given in behalf of the State is erroneous. It is based on written statements admitted in evidence for the purpose

of impeaching the witness Blue. It was error to attach the words: "Except as to such facts, if any, as you may find were admitted to be true by said witness in his testimony in this case." (2) Contradictory statements, which may be shown for purposes of impeachment must be pertinent to the issue and not merely matters of opinion, but facts which would be competent evidence independent of any inconsistency with the testimony of the witness. State v. Nave, 283 Mo. 35; Hamburger v. Rinkel, 164 Mo. 398; McFadin v. Catron, 120 Mo. 252; Wojtylak v. Coal Co., 188 Mo. 289; Schloemer v. Transit Co., 204 Mo. 115; 1 Greenleaf on Evidence (16 Ed.) 461, 462; State v. Patrick, 107 Mo. 161. (3) It was error on the part of the court to admit the statement marked "Exhibit D" in evidence. The statement was based on opinion and belief of the witness. Authorities last above. (4) Instruction 1 given by the court on behalf of the State is erroneous. It omits the word "feloniously" and does not contain equivalent language in defining robbery in the first degree. The statute and the indictment use the word feloniously. The instruction fails to comply with either. It does not even require the taking to have been unlawful or with a felonious intent. R. S. 1919, sec. 3307; State v. Rader, 262 Mo. 117; State v. Witt, 9 Mo. 665; State v. Gray, 37 Mo. 463; Kelly's Crim. Law & Prac., 657; 2 Bishop's New Crim. Law, sec. 840; 4 Blackstone's Comm., 232; 25 Cyc. 45. (a) The instruction does not even use the statutory words, or the words of the indictment, "rob and steal." State v. Weber, 188 S. W. 128. (b) The instruction refers the jury to the indictment, to ascertain the property taken. (c) The language of the instruction is duplicitous in this, that the statute provides, "taking the property of another from his person, or in his presence and against his will, by violence to his person, or by putting him in fear of some immediate injury to his person." The statute does not conjoin the two facts as constituting the offense. It is error to state the separate facts of the statute by the use of the word "or." The instruction should use the conjunction "and," where the statute uses the word "or." State v. Grossman, 214 Mo. 233. (5) The court erred in overruling defendant's motion in arrest of judgment. (a) The indictment is invalid and void for the reason that the body selected as a grand jury, had no power to return said indictment. The grand jury was not selected in the manner provided in Sec. 6700, R. S. 1919, as amended by Laws 1921. (b) There are no officers as designated by the statute to perform the duties required by said Section 6700 as amended in 1921. (c) Said Section 6700 as amended 1921 is the only law providing for the selection and drawing of grand jurors in Jackson County. A court has no jurisdiction to impanel a grand jury except in accordance with the provisions of law. 17 Am. & Eng. Ency. Law, 1262. Courts cannot supply omissions in legislation nor

afford relief because they are supposed to exist. United States v. Union Pacific Railroad, 91 U. S. 85; Hobbs v. McLean, 117 U. S. 579; United States v. Goldberg, 168 U. S. 103.

*North T. Gentry,* Attorney-General, and *A. M. Meyer,* Special Assistant Attorney-General, for respondent.

. (1)    Instruction 1 is a form approved in State v. Strada, 274 S. W. 34, and again in State v. Van Valkenburg, 285 S. W. 978.    (2) Instruction 4, on the purpose of the admission of prior contradictory statements by witness Blue, was in addition to oral instructions given by the court at the defendant's request at the time the statements were admitted.    It differs from the instruction on the same subject later offered by defendant only in permitting the jury to believe such part of those statements as were admitted by the witness while on the stand to be true statements of fact.    (3)    No error was committed in permitting State's counsel to question the witness Blue in regard to prior contradictory statements by him.    The whole of the statements were read and introduced in evidence with omissions marked by the court as incompetent with permission given in open court for defendant to read the expurgated portions also.    This is all that is required.    Littig v. Heating Co., 292 Mo. 247; State v. Craft, 299 Mo. 345.    The court heard evidence and found the statements admissible as voluntary matter.    State v. Johnson, 252 S. W. 624.    (4)    Defendant's plea to the jurisdiction was properly overruled.    (a)    Upon defendant's own evidence he was seventeen years of age October 20, 1922, having been born October 20, 1905 in Italy. The crime in question was committed May 4, 1923, and defendant arrested on May 11th of the same year, at which time therefore, on defendant's own testimony he was seventeen years old.    Section 2591 fixed the age at which offenders came within its provisions, at seventeen years.    The Act of 1923, raising said age to eighteen years did not go into effect until June 25, 1923, or more than a month after the defendant was arrested.    Laws 1923, pp. 153-157, 401; Mo. Constitution, art. 4, sec. 36.    Further, the court, upon conflicting evidence, overruled defendant's plea to the jurisdiction, necessarily deciding that defendant was not a minor under the age of eighteen at the time of the crime and arrest.    This, it was within the power of the court to do.    State ex rel. Corella v. Pence, 262 S. W. 361; Ex parte Rush, 264 S. W. 689.

HIGBEE, C.—The defendant was convicted of robbery in the first degree, in the Circuit Court of Jackson County, upon an indictment returned by the grand jury September 7, 1923, was sentenced to

imprisonment in the penitentiary for a term of thirty years, and appealed.

The evidence for the State showing that the prosecuting witness was robbed as charged in the indictment is not disputed; it was corroborated by defendant's witness John Howard Blue. While the prosecuting witness positively identified the defendant as the robber, Blue testified that he could not identify him as the robber.

John W. Clohse had lived at 2920 Guinotte Street, Kansas City, Missouri, for thirty-five years. He had a barber shop and sold tobacco and candy on the first floor of the building at that number. He cashed checks for the accommodation of his customers. On May 4, 1923, about an hour before noon, he took a number of checks to the Merchants' Bank at Fifth and Walnut streets and cashed them, receiving $670 in bills of one, five, ten and twenty-dollar denominations. These he made into two rolls, placing one roll in the top of each of his socks. He then went to the National Bank of Commerce where he remained about an hour. He then started home in his touring car which was driven by Blue, his employee. Clohse sat on the front seat at the right of the driver. On the way home they drove over a viaduct across Chestnut Street, and turned to the right at a drive leading into Chestnut Street. A car was following them which, as this turn was made, ran into the right side of Clohse's car, the side on which Clohse was sitting. A man riding on the fender of the other car jumped onto the fender of Clohse's car and, pointing a revolver at Clohse, ordered Blue to drive on into the driveway above mentioned. This driveway ran through a cut. When in this cut the robber ordered Blue to stop the car and, covering Clohse with his revolver, took the two rolls of bills from Clohse's socks, and took from his person a diamond stud, a Masonic emblem studded with diamonds, a watch and chain, and from Clohse's finger a diamond ring containing a stone weighing about a carat and a quarter. These articles, aside from the money, were of the value of about $900. This occurred about noon on a clear day in Jackson County, Missouri.

Clohse testified that he saw the robber's face distinctly during the time of the robbery and identified him as the defendant. The defendant took the keys of Clohse's car and drove rapidly away with his two companions. The robbery was promptly reported to the police, with a description of the robber.

A week later, on May 11th, the defendant and two other Italians were observed by the police driving recklessly in a Buick car. The police stopped the car and arrested them. The defendant, who gave his name as Joe Accurso, or Caruso, was sitting on the front seat by the driver. He had a 38-caliber "special" revolver stuck behind the cushion at his right side, and fourteen 38-caliber "long" cartridges in his hand.

The defendant testified that he had been employed for some time as an office boy in the Federal Reserve Bank in Kansas City; that he was afflicted with a bad cough and was spitting blood; that he resigned and, about January 2, 1923, went to southern Texas for his health and remained there on Frank Palermo's ranch until about May 5th or 8th (the exact date he could not remember) when he returned to his home in Kansas City with his father and mother, brother and sister, and was arrested after his return, and that he knew nothing about the robbery. He was corroborated by his mother and Frank Carolla, a younger brother, and by Frank Palermo, as to his stay in Texas. Palermo, who lives in Kansas City, visited his family on his ranch on January 17, 1923, and again at Easter; defendant was there at those times and returned to Kansas City; he saw him in Kansas City some time in May. No one testified to having seen defendant in Texas later than Easter.

We quote from the statement of the Attorney-General:

"James Howard Blue, the only eye witness to the crime, excepting prosecuting witness, who testified, corroborated witness Clohse in every particular save that of the identity of defendant as the man who committed the crime. Blue testified that defendant did not look like the bandit and that the latter had gold teeth. Presumably, though it does not appear in the record, defendant's teeth were in fact of some less noticeable material.

"Cross-examined, this witness admitted having made and signed prior contradictory statements to the effect that defendant was the robber, and that he had been afraid to take active part in the prosecution because of threats made to him by three Italians in a Buick car who drove up to his home one night; admitted that in those statements he swore that Carolla, the robber and the leader of these callers, were the same; admitted that in those statements he swore that defendant offered him a bribe to refuse to identify him and to testify that the robber had 'a fuller face and gold teeth;' admitted that when the bribe was refused violence was threatened against him and his family; admitted that in the statements referred to he had admitted giving false testimony before the justice of the peace to the effect that the robber had gold teeth; admitted that Carolla approached him at the preliminary hearing and asked witness to determine whether or not Clohse would drop the prosecution if he could thereby regain his stolen property."

The witness Blue, on cross-examination, identified State's Exhibits B, C and D, saying he signed them after being put through the third degree. He also stated, however, that he signed Exhibit D voluntarily and that it was true. On re-direct examination he said he signed Exhibit D after being beaten by the police. This the officers denied *in toto* and testified that Blue signed the exhibits volun-

tarily. Exhibits B, C and D were offered in evidence over the objections of the defendant that they were procured by duress and that they were incompetent and inadmissible for impeachment or for any purpose. They were admitted in evidence except parts excluded in parentheses, the court saying:

"BY THE COURT: Objection overruled. The statements about to be introduced are admitted for the purpose of impeachment of the witness now on the stand, if they have that effect, of tending to impeach and contradict the testimony of the witness in chief and that is the only purpose of the testimony. Defendant excepts.

"MR. RADER (attorney for defendant): I ask the court to instruct the jury the matters contained in the affidavits are not being introduced for the purpose of establishing evidence against the defendant.

"THE COURT: I have already made the matter clear.

"The defendant excepts and asks the court to instruct the jury more fully that the affidavits cannot be considered, such as the parts relating to the visits at the witness's home, cannot be considered in evidence in considering the guilt or innocence of the defendant, but only for the purpose of deciding whether or not they believe the witness Blue.

"THE COURT: I will give the proper instructions to the jury at the close of the case. Defendant excepts.

"THE COURT: The parts of the statements inclosed in parentheses are excluded and not to be read to the jury, but permission is given to defendant to read the entire statement if he wishes. Defendant excepts."

Exhibits B, C and D were here read by counsel for the State, exclusive of the portions inclosed in parentheses. They are as follows:
"Exhibit B.

"State of Missouri)            August 25th, 1923.
County of Jackson)ss.

"James Howard Blue being of lawful age and being first duly sworn upon his oath states.

"My name is James Howard Blue. I am twenty-three years of age. I live at 3308 Guinotte St. with my parents. I am married but at present am not living with my wife. I am employed at the Creo Dip Co., Inc., 3500 Guinotte St., as a shingle packer.

"On May 4, 1923, about noon, I was driving Mr. J. W. Clohse, 2920 Guinotte St., to his home at 2930 Guinotte St. While at Chestnut Avenue and Cliff Drive three men held us up. Mr. Clohse was relieved of some jewelry and some cash. The bandits did not take anything from me. About one week later, police officers arrested an Italian by the name of Joe Caruso *alias* Pete Carolla. Mr. Clohse as well as myself positively identified this man as one of the three men that held up Mr. Clohse and myself. At police headquarters

and at the prosecuting attorney's office I positively identified Caruso *alias* Carolla as one of the three bandits that held up Mr. Clohse and myself. (Caruso *alias* Carollo was taken to Justice Joyce's court, but through some efforts his case was postponed three different times, however, the grand jury had indicted him later).

"To the best of my knowledge, about May 27, 1923, about midnight while I was laying in my bed at my home 3308 Guinotte Ave. I was not sleeping. I saw a light in my room, presumably from a flashlight, and about a minute later I heard someone say, 'Howard, come here.' I immediately put on my trousers and went outside where I saw three men in a new Buick machine. I walked over to the car, and immediately recognized Caruso *alias* Carollo. There were two other Italians in the car, back seat of the car, but I could not recognize them as it was very dark. Caruso then told me that his trial comes up on the 31st of May, 1923. Caruso then asked me how much I would take to be bought off. (By this he meant how much would I take if I would not identify Caruso as one of the three bandits that held up Mr. Clohse and myself.) I told Caruso that under no circumstances would I be bought off. (The three men then talked to themselves in Italian, which I was unable to understand.) Caruso then said all that I would have to say is that I—Caruso—is not the man. I again told him that under no circumstances would I accept a bribe. The men again talked to each other for a while. (One of the two Italians in the back seat said 'God damn you, we ought to kill you now.' I did not say anything in reference to this remark.) Caruso then said to me, 'All you will have to say that I—Caruso— has gold teeth and a fuller face.' I again told him, 'I will not say nothing.' Caruso then got very mad and swore at me. Calling me a son-of-a-bitch, bastard and other profane names. Caruso also said as he started away in the car that he was going to blow me up and my whole family. He said the window is an easy mark for a bomb. (As they drove away they made another remark, but I was unable to hear it). At this time Caruso also had said if he—Caruso—would return Clohse's stuff, would not case against him be dismissed. I told him I thought that John, meaning John Clohse, would be easy with him, but would not say whether or not Mr. Clohse would throw the case out of court.

" (Several days later I told Mr. Clohse that if he would not prosecute the Italian, meaning Caruso, possibly the articles would be returned to him. I did not tell Mr. Clohse that the Italians had talked to me in reference to his case. My reason for not telling Mr. Clohse was that I was in fear of the Italians, and that they would kill me. Mr. Clohse told me at this time, that he would like to have his stuff back, but did not tell me definitely, even if his merchandise was returned, whether or not he would prosecute him).

"On another occasion while in Justice Joyce's court Caruso came to me and said if Clohse stuff was returned to him, would he prosecute. I told him I did not know.

"(Seal)                              JAMES HOWARD BLUE."

"Exhibit C.

"On May 31, 1923, while in Justice Joyce's court, I made the remark to the court that the man that held up Mr. Clohse and myself had gold teeth. (On the strength of this the court reduced the original bond from $10,000 to $2000). I also stated to the court that Caruso was not the man that held up Mr. Clohse and myself. The sole reason for not identifying Caruso was that I was in constant fear of him as well as the other Italians.

"I know for a fact that Caruso is the man that held up Mr. Clohse and myself, and this statement which I am now making at detective headquarters to Harvey L. Newman, Sec'y Chief of Detectives, in the presence of Detectives J. L. Green and T. J. Higgins and J. W. Clohse, is the truth, no promises or threats being made to me while making this statement.

"JAMES HOWARD BLUE.

"Subscribed and sworn to this 25th day of August, 1923. My commission expires February 17, 1927.

"HARVEY L. NEWMAN, Notary Public.

"Witnesses:

"J. L. GREEN

"T. J. HIGGINS."

"That part of Exhibit D read to the jury by the prosecuting attorney is in words and figures as follows, to-wit:

"To the best of my knowledge Pete Carolla was about the size and general description of one of the bandits but I could not positively identify him. On or about May 27th at about midnight one night a car, which I think was a Buick touring car, drove out in front of my house and stopped. Our house is only about twelve or fifteen feet from the street and my room is in the front of the house. Someone threw a flashlight on my window and called 'Howard' and I thought it was some of my friends that wanted to see me. I slipped on my trousers and house-slippers and went out. About three men were sitting in the car and they asked me what it would take for me to keep quiet about the robbery and fail to identify Pete Carolla. I could not get a good look at the men in the car. After I could not recognize any of the men and they had asked me about keeping quiet I stepped back from the car onto the walk which was about five feet from the car. I told them that under no consideration would I accept a bribe on any case. They then talked in Italian for a few seconds and then asked me if Clohse would drop the prosecution if they would return the stuff they had taken off from Clohse. I told

them that I did not know. They talked in Italian some more and then they got hard. I backed away from the car a little farther and they told me that they would blow up the whole family and that my window would make a good mark for a bomb. As they drove away they cussed me and told me that they would get me. Sometime after that I went to Joyce's court in the west bottoms on Carolla's hearing. While there Pete Carolla met me as I was getting a drink and he whispered to me. He asked me again if Clohse got his stuff back would he drop the prosecution. I told him that I did not even want to talk to him and I walked on back in the court room. As near as I can tell from his voice and general description, Pete Carolla was the one that came out to my house that night at midnight and talked to me. I could not see him plain, as it was dark, but the voice and appearance was the same and he talked about the same thing. I know nothing about any other robbery. On this date, February 25, 1925, I have seen Pete Carolla in the county jail and picked him out from three other men and told him to his face that he was the man that had asked me about returning Clohse's stuff in Joyce's court, May, 1923. He asked me in the jail what I meant by saying that I had seen him in Joyce's court, and I heard him talk and recognized again his voice. To the very best of my knowledge and belief he is the same one that came to my home that night and wanted to bribe me and get me not to identify him, and threatened to kill me and my family. I make this statement of my own free will knowing that it is the truth, to the assistant prosecuting attorneys, February 25, 1925. No promises or threats or abuse have been given me.

"(Signed)    JAMES HOWARD BLUE.

"Subscribed and sworn to before me this 25th day of February, 1925. My commission expires May 8, 1926.

"(Seal)    "R. L. NIVENS, Notary Public."

The record shows that at the May term, 1923, in Criminal Division A of the Circuit Court of Jackson County, a grand jury of twelve good and lawful men of the body of Jackson County was **Juvenile Court: Jurisdiction.** duly impaneled and summoned according to law, and sworn and charged, and that afterwards during said May term, on September 7, 1923, said grand jury returned into open court and presented the indictment, to which the defendant pleaded not guilty on September 17, 1923, and on which he was tried and convicted.

On the application of the defendant a preliminary rule in prohibition was issued by our court en banc restraining the further prosecution of this and other criminal proceedings pending against the defendant in the criminal division of the Circuit Court of Jackson County, Missouri, for the reason as alleged in the application, that defendant was born on October 20, 1905, and being under eighteen

years of age, the juvenile court alone had jurisdiction to proceed against him for crime. The opinion of Judge J. T. BLAIR, in disposing of that case, concludes:

"It was the duty of that court [the criminal division], so far as any contention now made by relator is concerned, to pass on the question whether relator was under eighteen. There was no conclusive showing on the motion to transfer, that he was, and there has been no new evidence, which tends to prove it, offered here. If relator is under eighteen, the juvenile court has jurisdiction. No showing of this fact is so made that it will support the absolute writ. The preliminary rule is discharged." [State ex rel. Corella v. Pence, 303 Mo. 598, 262 S. W. 360, 362.]

In consequence of the pendency of said proceeding the trial of this cause was continued from time to time. On April 8, 1925, on defendant's application, a change of venue was awarded to Division 3 of the Jackson County Circuit Court. On April 14, 1925, defendant filed a motion for a continuance and a plea to the jurisdiction of the court, which were overruled. A motion to quash the indictment was also overruled. On April 15, 1925, the trial began before a jury. On April 17th, the jury returned a verdict of guilty as heretofore stated. Motions for new trial and in arrest were filed and overruled, and sentence was pronounced on May 13th.

The plea to the jurisdiction is in substance: 1. This cause was pending in Criminal Division A at the May term, 1924, and was transferred to Division 8 of the circuit court. 2. At all times mentioned in the indictment the defendant was under the age of eighteen, and under the Juvenile Act, Session Laws 1923, Sections 2591 to 2597, the Juvenile Court of Jackson County has exclusive charge of the violation of law upon the part of minors under eighteen years of age, and the said criminal court has only power to originate said proceedings and, under Section 2598, can transfer said cause to said juvenile court. 3. The defendant was at all times under eighteen years of age and, during the March term of court, 1919, was adjudged a minor under twelve years of age in the Juvenile Court of Jackson County, and was duly sentenced to the McCune Home for two years in the case of State of Missouri v. Pete Carolla, and said juvenile court, under Session Laws of 1923, retained jurisdiction of defendant until he was twenty-one years of age. Wherefore defendant prays this court not to take cognizance, etc.

This plea and motion for continuance were heard together and, as stated, were overruled. Counsel for defendant stated they were asking a continuance for thirty days for the reason he had lost the defendant's certificate of birth, issued by the mayor of the city in Italy where defendant was born, which birth certificate counsel had misplaced and was unable to find; that the certificate recited that

defendant was born October 20, 1905, and they could procure another certificate in thirty days.

Tony Carolla, defendant's father, testified he did not remember the date of defendant's birth, but at the time of the hearing he lacked seven or eight months of being twenty years old. Rosa Carolla, defendant's mother, testified defendant was born in Italy on October 20, 1905; that she gave the birth certificate, signed by the mayor, to Mr. Rader, defendant's attorney; it read October 20, 1905; that Pete went to school when he was four or five years old; that she lied about his age to get him into school; they took him into school because she said he was six years old; she had no record of his birth in the Bible.

Pending the hearing of the motions, Mr. Rader found the birth certificate and offered it in evidence. It was excluded because it was not duly authenticated. It is not preserved in the bill of exceptions. The defendant testified: ''I was nineteen on October 20, 1924. I was in the juvenile court two or three times before Judge Porterfield; could not tell when; can't tell the year; the last time was in 1919; I might have been there in 1916; I was there only once; I don't know what I was charged with; got sentence for two years.''

The State offered in evidence records of the public school of Kansas City, Missouri, kept in the regular course, showing that defendant was born April 10, 1905; that he was eighteen years of age on April 10, 1923, prior to the date of the robbery.

Section 2591, Revised Statutes 1919, of the Juvenile Act, pertaining to juvenile courts in counties having 50,000 inhabitants or over, applies to children under seventeen years of age. The defendant, according to his own evidence, was over the age of seventeen years and was not within the provisions of the act when the robbery was committed on May 4, 1923. The act of April 5, 1923, amending this section, raising the age to eighteen, became effective June 25, 1923, and so was inapplicable to this case. This fact, it seems, was not called to this court's attention at the hearing of the prohibition case. At any rate the opinion in that case left the matter of determining the defendant's age to the trial court on a motion to transfer to the juvenile court. That issue was tendered on the plea to the jurisdiction and, on conflicting evidence, the court found the defendant was not under the age of eighteen at the time of the robbery. This finding of fact by the court is conclusive on appeal.

The defendant moved to quash the indictment for the reason that the grand jury returning it was not selected in the manner provided by Section 6700, Revised Statutes 1919, as amended by Session Laws of 1921, extra session; that said section, as amended, is the only law providing for the selection and drawing of grand jurors in Jackson County; it contemplates there shall be a

**Grand Jury.**

jury commissioner as required by Section 6672, Revised Statutes 1919, etc.

The record recites that a grand jury of twelve men was duly impaneled and summoned according to law, sworn and charged. Section 3860, Revised Statutes 1919, reads: "No challenge to the array of grand jurors, or to any person summoned as a grand juror, shall be allowed in any other cases than such as are specified in the last section." We have neither the time nor the inclination to go into these contentions in detail, as the matter has been thoroughly considered in former decisions of this court. In State v. Crane, 202 Mo. 73, 100 S. W. 422, Judge GANTT, after quoting the sections of the statute, now Sections 3859 and 3860, Revised Statutes 1919, and reviewing former decisions of this court, said: "On no subject has our statutory law remained unchanged longer than this, and the decisions have been uniform. In his plea in this case, the defendant merely complains of the manner of impaneling a grand jury which had been summoned and sworn and was in session when he shot his wife.. In the nature of things he could not have been present to challenge the array or any juror before the panel was sworn. But if he had been present the objections embodied in his plea in abatement and motion to quash would have availed him naught in the face of the positive and salutary provisions of Sections 2487 and 2488, Revised Statutes 1899." See also the recent case of State v. Gowdy, 270 S. W. 310, where the question was learnedly considered by Judge RAILEY. We might very well have treated the foregoing contentions as abandoned, since they are not referred to in the brief of appellant's learned counsel.

The first contention in appellant's brief is that the bill of exceptions fails to show the venue of the offense and for this reason the case must necessarily be reversed. Counsel have inadvertently overlooked the testimony of the prosecuting witness, on page 186 of the bill of exceptions, that the robbery took place in Jackson County, Missouri.

*Instruction:*
*Admissions.*
*Venue.*

Error is assigned in giving Instruction 4, which reads: "The court instructs the jury that the written statements of the witness Blue offered and introduced in evidence were admitted by the court for the purpose only of impeaching the testimony of said witness, and are not to be considered by you as proof of the matters and facts contained in said statements *except as to such facts, if any, as you may find were admitted to be true by said witness in his testimony in this case.*"

Counsel say the portion we have italicized, erroneously makes such statements substantive evidence against the defendant. Blue had corroborated the prosecuting witness as to the circumstances of the robbery, but testified the robber hit him on the head; that he just

316 Mo.—15.

got a glimpse of the robber's face and some gold teeth, and when his attention was called to the defendant in the court room, he said he could not identify him as the robber, that he had never seen him before he saw him in the show-up room, and he could not say defendant was one of the three Italians who came to his house in the Buick car on the night of May 27, 1923. He testified that he signed the statement, Exhibit D, voluntarily, and that it was true, and afterwards, on redirect examination, without any explanation of this testimony or claim of mistake or misunderstanding on his part, unblushingly swore this signed statement was extorted from him by violence. It was clearly competent for the State to read in evidence these previous inconsistent statements of this recalcitrant witness for the purpose of impeachment and contradiction of his evidence in chief. [Gordon v. Railroad, 222 Mo. 534, 121 S. W. 80; State v. Stegner, 276 Mo. 439, 207 S. W. 826; 40 Cyc. 2687.] The jury would clearly understand by this instruction that statements in the exhibits were not to be considered as evidence or proof of matters or facts therein stated, except such facts, if any, as they might find were sworn to be true by the witness in his testimony. There was no error in giving the instruction.

Under this head it is insisted it was error to admit statements of the witness Blue that "to the best of my knowledge Pete Carolla was about the size and general description of one of the bandits, but I would not positively identify him." "As near as I can possibly tell from his voice and general description, Pete Carolla **Opinion.** was the one that came out to my house that night at midnight and talked to me." It is insisted that these statements were not statements of facts, but were matters of opinion and that a witness cannot be impeached by matters of opinion and belief. Counsel cite State v. Nave, 283 Mo. 35, 222 S. W. 744, where, quoting syllabus 1, it is said: "Contradictory statements, to be competent for purpose of impeachment, must be statements of fact pertinent to the issues, and not merely matters of opinion. So that testimony of a witness that he had stated to defendant's father that he thought defendant had stolen the mules is not competent for the purpose of impeaching the father's testimony, but its admission is gross error."

Clearly this was not the statement of any fact within the knowledge of the witness. The rule on the point under consideration is thus stated: "Provided he bases his testimony on his own knowledge and not on information furnished by another, the opinion, belief, judgment, or impression of an ordinary witness as to the identity of a person or an object is competent evidence." [16 C. J. 750, sec. 1537; State v. Hopkirk, 84 Mo. 278; State v. Powers, 130 Mo. 479, 32 S. W. 984; State v. Cushenberry, 157 Mo. 168, 56 S. W. 737.] The statements were in this sense statements of fact and admissible as

affecting the credibility of the witness Blue as to his evidence in chief. [Rock v. Keller, 312 Mo. 484, 278 S. W. 759.]

**Feloniously.** Appellant challenges Instruction 1, in that it does not use the word "feloniously," nor define robbery in the first degree, nor require the taking to have been unlawful or with a felonious intent. The instruction reads:

"The court instructs the jury that if you find and believe from the evidence that at any time within three years next before the 7th day of September, 1923, the date of filing of the indictment herein, at Jackson County, State of Missouri, the defendant Pete Carolla *alias* Joe Accurso, took and carried away any money or property described in the indictment the property of John W. Clohse from his person or in his presence and against his will, by force and violence to his person by putting him in fear of an immediate injury to his person, without any honest claim to such money or property on the part of defendant, and with the intent to deprive said John W. Clohse of his ownership therein, then you will find defendant guilty of robbery in the first degree and assess his punishment at imprisonment in the state penitentiary for any term not less than five years.

"The word 'feloniously' as used in these instructions, means wickedly and against the admonition of the law, that is, wickedly and unlawfully."

The instruction did not use the word "feloniously," but it required the jury, in order to convict the defendant, to find that he took and carried away the property of John W. Clohse from his person or in his presence and against his will by force and violence to his person, by putting him in fear of an immediate injury to his person, without any honest claim to such money or property and with intent to deprive Clohse of his ownership therein. This includes every element of robbery in the first degree. It was unnecessary to use the word "feloniously," as that is a word of classification, not of definition nor a part of the crime. Such words are merely descriptive of the grade of the offense and would not enlighten or aid the jury in determining if the violent acts of the defendant in taking the money and jewelry of the prosecuting witness from his person at the point of a revolver and carrying them away with intent to deprive him of his ownership therein, was robbery in the first degree. [State v. Cummins, 206 Mo. 623, 105 S. W. 649; State v. Spray, 174 Mo. 573, 74 S. W. 846; State v. Reagan, 280 Mo. 71, 217 S. W. 83; State v. Hildebrand, 285 Mo. 290, 295.] Ordinarily such words have no place in an instruction in a criminal case. "On the contrary the general rule is in robbery as in ordinary cases, that feloniously need not be used in the instruction, or if used that it need not be defined." [State v. Rader, 262 Mo. 132, 171 S. W. 46.] Again, on page 134, Judge FARRIS said: "Having regard to many

of the common-law definitions of larceny which omitted the word 'felonious' and the variant holdings on this point and on analogous questions by this court, we conclude that an instruction for grand larceny ought to require the finding by the trial jury that the taking was with a felonious intent, but that the use of the specific words 'felonious' or 'feloniously' is not absolutely a prerequisite. This intent may be aptly defined by terms indicating the wrongful and fraudulent, or criminal nature of the taking, coupled with words charging the taking as being without the owner's consent and with the fraudulent intent to convert the property to the use of the taker and to deprive the owner thereof permanently.'' [Citing cases.]

The statute, Section 3307, reads: ''Every person who shall be convicted of feloniously taking the property of another from his person, or in his presence, and against his will, by violence to his person, or by putting him in fear of some immediate injury to his person, shall be adjudged guilty of robbery in the first degree.''

The felonious intent which is essential to constitute the crime of robbery is clearly expressed in this instruction by the use of equivalent words. This, to a jury, more clearly expresses the felonious intent than the use of the word ''feloniously.'' It embodied all the elements of the crime charged.

Counsel say the instruction is duplicitous: it defines the offense ''from his person *or* in his presence and against his will, by force and violence to his person *by* putting him in fear of an immediate injury to his person.'' ''The instruction should use the conjunction 'and' where the statute uses the word 'or,' citing State v. Grossman, 214 Mo. 242, 113 S. W. 1074. In the Grossman case the verdict finding the defendant guilty of selling *or* otherwise disposing of liquor on Sunday, as charged in the information, was held not responsive to the issues where the information charged several offenses conjunctively. The information in this case charges the defendant with one offense, taking ''the money and personal property of the said John W. Clohse from the person and against the will,'' etc. In State v. Lamb, 242 Mo. 400, 146 S. W. 1169, Judge FERRISS said: ''The information charges robbery 'from the person,' while the proof was that it was 'in the presence of' the prosecuting witness. We do not regard this question as a serious one. At common law it was ruled that the charge of robbery from the person was satisfied by proof that the money was taken in the presence of the person.'' There is no merit in the criticism.

Other instructions given are not criticized. They fairly and clearly instructed the jury on all questions of law arising in the case and necessary for their information in returning their verdict. They included the subjects of alibi, the burden of proof, reasonable doubt, the presumption of innocence and the weight and credibility

of the evidence. The court refused six instructions asked by the defendant. So far as they properly declared the law they are covered by those given for the State.

The sufficiency of the indictment is not challenged either as to form or substance. It follows approved precedents. [State v. Affronti, 292 Mo. 67, 238 S. W. 106; State v. Huffman, 238 S. W. 430; State v. Strada, 274 S. W. 34; State v. Van Valkenburgh, 285 S. W. 980.]

Other errors are assigned, but they are without substance; to discuss them would be unreasonably to extend this opinion, already too long, and would be simply rethreshing old straw. The defendant had a fair trial before an impartial jury.

The judgment is affirmed. *Railey, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.