THE STATE v. ISOM BAXTER, Appellant.—130 S. W. (2d) 584.

Division Two, July 7, 1939.

*Corbett & Peal* for appellant.

*Roy McKittrick,* Attorney General, and *Lawrence L. Bradley,* Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant was convicted of manslaughter in the Circuit Court of New Madrid County, on change of venue from Pemiscot County, for stabbing and killing Leroy Johnson, a young man about twenty-one years old. The punishment assessed by the jury was two years' imprisonment in the penitentiary. The assignments of error in his brief all face toward one proposition—that an alleged dying declaration of the deceased, testified to by a witness named Charles Hurley, was improperly admitted in evidence because there was not a sufficient showing that it was made in view of impending death. It is urged that eliminating the dying declaration the State failed to make a case for the jury; and that the trial court erred in refusing to sustain his motion for a new trial on the ground of newly discovered evidence, this being disclosed by the affidavits of three witnesses tending to impeach Hurley's testimony concerning the dying declaration.

The homicide was committed on Christmas Eve, 1936, at a dance hall in Pemiscot County. The deceased Johnson and Howard Sigert, a son-in-law of the appellant, had engaged in a fight. Appellant seized Sigert's arms from behind and there was some testimony that another man held Johnson, thereby separating them. The testimony

for the defense was that Johnson either was not thus restrained by the other man or that he freed himself—at any rate that he advanced toward Sigert and struck him while Sigert's arms were being held by appellant. Some of the people cried "turn him loose," whereupon appellant released Sigert who started forward to resume the fight. The State's evidence from several witnesses was that without any such threatening demonstration and assault on the part of Johnson, appellant released Sigert saying "Get him, Howard." Sigert lunged toward Johnson with an opened pocket knife in his hand according to some of the witnesses, with a beer bottle according to others, and without anything except his doubled fist according to still others.

He struck Johnson who fell into a small booth alcove or recess in the wall where the view was obscured because it was poorly lighted and some beer cases were stored there. Sigert followed Johnson into the booth and stabbed him several times, coming out with the bloody knife in his hand. The attending physician, Dr. A. J. Speer of Deering found Johnson had ten stab wounds in the left side of the chest, both anterior and posterior. These bled profusely. The location and nature of the wounds were such as to warrant an inference that they were made by one person with a pocket knife. Four of them were fatal. Two penetrated close to the spine, one was in the region of the kidney, and three entered the lung permitting air to pass out in breathing. There was nothing to indicate the wounded man had been drinking intoxicants. The doctor stayed with the patient 15 or 20 minutes and told the family there was no hope of recover. He was then taken to a hospital in Blytheville, Arkansas, where he died in about five or six hours.

One witness for the State, Doyne Huey, said appellant also went into the booth, or rather that he saw appellant coming out of one end of the booth with Sigert whereas Johnson came out the other end, staggering. This was the only testimony from a third party witness putting appellant at the exact spot where the fatal stabbing occured. Several witnesses impeached Huey by testifying he was not in the dance hall when the assault was committed but in an adjoining room where he could not have seen it. The appellant declared he did not go into the booth during the fight and in this was corroborated by two or three witnesses. His general reputation for peace and as a law-abiding citizen was attested by several witnesses. No witness saw the appellant actually participating in the fight. So, unless the jury were entitled to draw the inference that appellant took part in the fight from the testimony that he released his restraining hold on Howard Sigert, who did the actual stabbing, and said "Go get him, Howard," coupled with the testimony of the witness Huey that he saw appellant come out of the booth with Sigert just after the stabbing—unless this evidence was sufficient, we say, it was vital to the State's case that further proof connecting appellant with the fatal

assault be furnished by the deceased Johnson's alleged dying declaration. Was the evidence sufficient to justify the introduction of the latter?

Bearing on that point the same State's witness, Doyne Huey, testified he assisted Johnson out of the dance hall and as they had about reached the door Mrs. Baxter, appellant's wife, kicked Johnson. This witness said he walked part way with Johnson toward the latter's home when Johnson "said he was dying and told me to lay him down and get a doctor." Being asked again what Johnson said, the witness quoted him: "I am dying, they have killed me." Johnson did not say who "they" were, and did not specifically accuse appellant. The witness left to get a conveyance, and as he was departing saw some boys pick up Johnson and carry him to his home, which was about one-fourth mile from the dance hall. This was about midnight. Another witness, Odie Goodman, speaking of the time when Johnson was being led out of the dance hall, said: "I run as soon as I seen them leading him out the door and I run and caught up with him at the bridge and he told me that he was cut and I went after the doctor and that was all." Doyne Huey was with Johnson when this witness, Goodman, overtook them.

Charles Hurley, the admission of whose testimony is assailed by appellant, lived across the street from the home and office of Dr. Speer, about 150 feet from the Johnson home, and apparently on the way between the dance hall and the latter. Hurley said he was awakened by Johnson's voice "holloing out" at the doctor's office. He got up and as soon as he could dress ran to the Johnson home and proceeded immediately to Johnson's bedside. Johnson worked with the witness at a cotton gin and they were good friends. He testified that Johnson recognized him by his voice and when he went into the room and said "that he was killed and that they had killed him and he was going to die;" and that he wouldn't be able to work with the witness at the cotton gin any more. Hurley asked him who did the cutting and Johnson replied, Howard Sigert and Isom Baxter (the appellant). Then Hurley asked Johnson why he didn't get up during the fight and Johnson answered (quoting the witness's statement of what the deceased said), that "he couldn't get up, Howard Sigert had me down cutting me and Isom Baxter was holding me—he had one hand on my shoulder and one hand on my head."

Hurley was sharply questioned on cross-examination about two things. One was when he arrived at the Johnson home and when the alleged dying declaration was made, with reference to the time of Dr. Speer's arrival. At first he said he didn't know. Then he stated that the doctor was still at home when he got to Johnson's house. Following that he declared the doctor was not in the bedroom and had not been when Johnson made the dying declaration. He also said he helped the doctor dress Johnson's wounds, which was after Johnson

made the statement. Later he testified the doctor left the room to prepare his needles and dressings and that he (the witness) didn't know whether it was before or after that when the declaration was made, or whether the doctor was in the room at the time—because people were going in and out. He didn't remember of Johnson's expressing any hope of getting well, but wouldn't say either way about that.

All this testimony was given during a preliminary examination in the absence of the jury. After the jury were brought back the witness repeated some of what he had said before, but this time said *part* of the dying declaration was made before the doctor came. This was the part in which Johnson said he was killed and going to die and wouldn't be able to work in the cotton gin any more. Then three to five minutes later he made the rest of the declaration. The witness said he didn't know whether Johnson made part of the statement while the doctor was there. He also agreed that it may have taken ten or fifteen minutes for Dr. Speer to get ready, and he thought the doctor had to go back to his office for something. The import of all this, we take it, is that at least the latter part of the dying declaration might have been made in this interval during the doctor's absence.

The second point on which the witness was searched by cross-examination was why he had never testified concerning the dying declaration until the trial below, and whom he had told about it. It was shown there had been four occasions on which he might have done so: (1) the coroner's inquest; (2) the preliminary hearing; (3) the trial of Howard Sigert; (4) and the first trial of the appellant at which the jury disagreed. Appellant was asked why he had not testified at any of these hearings although he was a good friend of the deceased, and he answered that he had never made a secret of the confession; that he told his wife about it the night Johnson was stabbed on December 24. But he admitted he didn't disclose the fact to Johnson's father until February or March of the following year, and then only after the father asked him about it. The witness didn't know how the father got the information that he had heard the dying declaration but said he had told several persons including Owen Tyler and the gin crew.

Dr. Speer, who had been a witness for the State, was recalled by appellant's counsel for further cross-examination. He testified that when called to attend Johnson he found him in a dying condition. His ministrations covered a period of fifteen or twenty minutes. During all that time the wounded man gave utterance to only one sentence that the doctor could understand, which was: "Pray that I may live." This statement showed he was conscious at the moment, and his mumblings indicated he was complaining of what produced pain. Other than that it was the doctor's opinion that Johnson was not

conscious. Dr. Speer further said he didn't remember of witness Hurley's being there that night. The ones he did remember seeing were members of the immediate family, and Lorene Pulliam, a girl with whom he went to the dance.

■ Considering all the facts in evidence we think the dying declaration as detailed by the witness Charles Hurley was properly submitted for the consideration of the jury. It is obvious that Johnson must have known he was mortally wounded, and that he was weakening rapidly. After he had walked part way home with the assistance of the witness Doyne Huey, he declared to the latter that he was dying, that "they have killed me," and requested that he be laid on the ground and that a doctor be summoned. That evidence went in without objection. Evidently only a few minutes later he told the witness Hurley "that he was killed and that they had killed him and he was going to die." It could not be denied that this evidence, standing alone, would be sufficient to take the case to the jury.

But appellant relies on the testimony of Dr. Speer to the effect that the wounded man had lost consciousness, or at least the ability to express himself, when he got there, save for the one utterance "Pray that I may live." But it must be remembered, first, that this is only *impeachment* of Hurley, who testified Johnson did make the statement. The jury had a right to pass on that contradiction. Again, the doctor did not fix the time when Johnson said "Pray that I may live." If he thought he was going to die soon and entertained no hope of recovery when he made the declaration it would be competent even though his hope may have revived somewhat after the doctor had treated him. [State v. Turlington, 102 Mo. 642, 656, 657, 15 S. W. 141; State v. Kilgore, 70 Mo. 546, 553.] And finally, we are not persuaded that his expression "Pray that I may live" necessarily indicated he hoped or believed he had any chance to live. Many a man has made such an appeal though knowing it was too late.

■ The other point made in appellant's brief is that the trial court erred in failing to grant his motion for new trial on the ground of newly discovered evidence, this being, as is alleged in the assignment, the affidavits of Owen Tyler, Freeman Tyler, and Jess Biggs. It will be remembered that when the witness Charles Hurley was cross-examined as to whom he had told about the dying declaration of Johnson, he answered, "Owen Tyler and the gin crew." The affidavits are offered to impeach him on that point. All the affiants aver that they worked at the cotton gin where Charles Hurley was employed, and that Hurley never did tell them about Johnson's dying declaration.

We cannot pass on this assignment because of the condition of the record. It comes here in three separate pieces. The first includes the bill of exceptions. It was filed on December 17, 1938. But it omitted certain essential parts of the record, including the motion

for new trial, although the transcript recites such a motion was filed on June 3, 1938 in due time, and overruled on June 23, 1938. The Attorney General filed Suggestions in Diminution of Record, and certiorari was ordered. The circuit clerk then sent up another transcript which was filed here on March 7, 1939. It contains carbon copies of *two* motions for new trial, one of which, in case No. 2602, appears to have been filed in the fall of 1937, evidently after appellant's first trial. The other carbon copy, in case No. 4065, is made out to be sworn to by the appellant on the ―――― day of June, 1938, before ―――――――――― Notary Public. The blanks are not filled in. There is nothing to show that it was filed, or when, except the general certificate of the circuit clerk that the "above and foregoing is a full, true and complete copy of the record proper, and a full, true and complete copy of the bill of exceptions (in the cause) as fully as the same appear of record and on file in my office."

This motion does contain an assignment praying a new trial because of the newly discovered evidence of the said Owen Tyler, Freeman Tyler and Jess Biggs bearing on the impeachment issue already stated. The motion further recites that the affidavits of these three witnesses are attached, marked Exhibits A, B and C. But they are not attached; instead there are affidavits by three other persons on other issues, but bearing the exhibit letters aforesaid. Two months later on May 8, 1939, the circuit clerk sent up and filed here what we suppose are copies of the intended affidavits of the two Tylers and Biggs. But the clerk's certificate merely says they are a true copy of the "original files in case No. 2602." This is the original case number, *not* that shown on the second motion for new trial. There is nothing to show that the affidavits were attached to or filed with the motion, or when they were filed. We are left entirely to broad inference as to what these documents are. Clearly the record is insufficient. We need not go into the merits of the motion, as it does not prove itself.

▮ One point briefed by the Attorney General and orally argued by appellant's counsel was this. The State's Instruction No. 3, defined manslaughter substantially in accordance with Section 3988, Revised Statutes 1929 (Mo. Stat. Ann., p. 2793); and told the jury if Howard Sigert stabbed and killed Johnson without malice or premeditation, and under such circumstances as not to constitute justifiable or excusable homicide, and that the appellant was present aiding, abetting, encouraging or assisting him in so doing, then they should find him guilty of manslaughter. The instruction omitted the word "feloniously." The learned Assistant Attorney General sufficiently answers the appellant's complaint on that ground by citing such cases as State v. Carrolla, 316 Mo. 213, 227, 292 S. W. 721, 727.

Finding no reversible error, the judgment is affirmed. All concur.