THE STATE v. THURMAN BLACKMORE and MARSHALL GODSEY, Appellants.—38 S. W. (2d) 32.

Division Two, April 14, 1931.

*Ross E. Feaster, W. G. Davis* and *Henry P. Lay* for appellants.

*Stratton Shartel,* Attorney-General, and *Carl J. Otto,* Assistant Attorney-General, for respondent.

COOLEY, C.—By an information filed in the Circuit Court of Johnson County appellants and one Charley Jones were jointly charged with robbery in the first degree, the information charging that they had robbed the Bank of Knobnoster on March 15, 1928. They were granted a change of venue to Cooper County. Jones pleaded guilty. Appellants Blackmore and Godsey were tried jointly in March, 1929, and convicted, and each was sentenced to ten years' imprisonment in the penitentiary. They have perfected a joint appeal to this court.

Numerous alleged errors are set forth in appellants' motion for a new trial, of which, however, their counsel in their brief filed here frankly say they are now urging but three, viz., that the evidence was insufficient to sustain a conviction; the action of the prosecuting attorney in propounding certain questions in the cross-examination of some of defendants' character witnesses; and certain remarks of the prosecutor in his closing argument to the jury. The claimed insufficiency of the evidence is in the identification of appellants as participants in the robbery.

In the forenoon of March 15, 1928, the time being estimated at about 9:30 to 9:45, a large automobile, described by some witnesses as a Gardner "straight eight," containing four men, stopped in front of the bank. One remained in the car behind the steering wheel. The other three entered the bank. One at least of those three exhibited a gun. The cashier and assistant cashier, who seem to have been the only persons in the bank, were ordered to "stick 'em up quick," which they did, and were then compelled to lie on the floor while the robbers proceeded to ransack the bank, securing $4450.25. They left the bank, re-entered the waiting car and drove rapidly out of town, going east.

The cashier, Mr. Kendrick, testified that he got a general view of the men who came into the bank; that they were masked; that only in a general way could he describe the appearance of the man who ordered him to lie down; that he was a broad shouldered, tall man, of normal build, walked "kind of swingy," and had dark eyes; he had a gun pointed at witness; that defendant Godsey looked very much like that man, but he could not identify him positively.

Frank Shepherd, assistant cashier, described one of the men who entered the bank as of medium build and with dark, keen eyes. Asked if he had seen him since he answered: "I couldn't positively swear that I have." He also testified: "His shoulders were kinder

stooped a little, I believe.'' He was not permitted to state whether or not he had since seen a man he believed to be that man.

Robert Caldwell, a colored man twenty-one years of age who lived at Knobnoster, saw the man who waited in the car while the robbery was in progress. He walked by the car, within four or five feet of it, and ''kinda slacked up'' and looked at the car and the man in it. He testified that the man was not masked, had on a big overcoat and had a little moustache, he couldn't exactly tell what color; the man was smoking a cigarette ''and he raised up.'' He further testified that he thought he saw that man again at Warrensburg, where defendants' preliminary hearing was held several weeks after the robbery.

''Q. Do you know the man you saw at Knobnoster that day? A. Yes, sir, I think so.

''Q. Do you see him here? A. I think so.

''Q. Can you point him out? A. That looks like him there. (Indicating defendant Blackmore.) . . .

''Q. Do you know this man's name? A. No, sir.

''Q. You know his face, but don't know his name? A. Yes, sir.''

On cross-examination he said he had seen a man at Warrensburg that he thought was the same man, but didn't tell any one there; that he had rumors that he would be killed if he told—it was talked ''around town,'' not by defendants.

''Q. You did tell Sheriff Lane (at Warrensburg) that you didn't know either one of these boys? A. I didn't tell him exactly that . . . I told him I didn't know exactly and he never put me on the stand . . .

''Q. You never saw Mr. Blackmore? A. I saw him one time in Warrensburg and one time here, and I saw him in the car out there.

''Q. You don't know whether he was in the car or not, do you? A. I said I thought he looked like the fellow that was in the car.''

A witness for defendants testified that Caldwell told him after the preliminary that he had been at Warrensburg, but couldn't identify defendants, ''or words to that effect.'' That witness and the (then) sheriff testified that Caldwell seemed frightened at the time of the preliminary.

Ira Michael, night watchman at Knobnoster, saw the Gardner car standing in front of the bank and noticed the man behind the steering wheel. The engine was running. He pointed out Blackmore as the man he thought he had so seen. He admitted that at the time of the preliminary he had not identified Blackmore. He further testified in substance, quoting from appellants' brief: ''I next saw him here today. When I saw him here this morning I first made up my mind I could identify him. I didn't say I could identify him for a certainty. I think he is the man.''

About the time of the robbery, Frank Pickett was driving a truck eastward on Highway No. 50. About three miles east of Knobnoster he was passed by a Gardner "eight" automobile going at a high rate of speed. There were "four or five" men in it. As it passed witness it swerved sharply to the right in order to avoid collision with another car, nearly turning over. Pickett testified that that motion of the Gardner car threw the occupants of the rear seat "over into a sideway position" and he got a view of one of them through the rear window of the Gardner; that the man "turned his head kinda sideways more than the car threw him" and remained thus for probably three seconds; that he, witness, believed defendant Godsey, whom he pointed out, was the man he had thus seen; that he remembered him particularly by his high cheekbone; that he wore a gray hat and an overcoat.

It is apparent from the evidence that the Gardner car which passed Pickett was the one used by the robbers as they left the scene of the robbery. About six miles southeast of Knobnoster, a "big car," evidently the same one, going rapidly, was seen by witness Croll to drive up behind a Ford coupé which was travelling slowly in the same direction. As the big car approached it the coupe "sped up" and both went on about a quarter of a mile and stopped at a cross-roads. One man was in the Ford coupe. When the cars stopped one man got out of the big car and into the Ford, which would leave three in the big car, as there were four in it when it left Knobnoster, and then the Ford went north and the big car went south. Croll estimated the time as about ten A. M. Some distance south of that cross-roads the Gardner car which had been used by the robbers was abandoned, and shortly thereafter, that same morning, was found and brought to Knobnoster. The sheriff immediately on learning where it had been abandoned, went to that point and found tracks of another car going south therefrom, which tracks he followed southward three or four miles until he "lost the trail" because of falling snow.

Farther south a Ford car stopped that day at the farmhouse of John Goring. It was not on a main highway. Mrs. Goring testified that it was about thirteen miles from Knobnoster, and estimated the time at about 10:30 A. M. There were three men in the car. They stopped to get water for the radiator which was leaking. Two of them got out of the car and one borrowed a bucket to carry water to the radiator, while the other borrowed a tire pump and pumped up a tire. They seemed to be in a hurry, attracted Mrs. Goring's attention. They also inquired about the road. Mrs. Goring identified and pointed out defendant Godsey as one of those men, and testified that Charley Jones was another. She did not identify Blackmore.

, About two miles farther south that same forenoon, a Ford car containing three men stopped at the farmhouse of Charles Miller to get water. Mr. Miller said the time was between ten and eleven A. M. It was evidently the same car which had stopped at Goring's. Fred Miller, seventeen, son of Charles, waited upon the men. He testified that the car "looked like it was pretty hot and one tire was pretty soft." Fred talked with one of the men whom he recognized and pointed out at the trial as defendant Blackmore. Blackmore "talked like he was off the road and asked me if I knew where somebody over west lived, I've forgotten his name, . . ." He also said he wanted to go to Windsor (some seven miles distant) and told witness he was a son of Dr. Blackmore, a prominent citizen of Windsor.

Charley Jones, who had been jointly charged with appellants, had been brought from the penitentiary and was called to the witness stand by the prosecuting attorney. He proved a "surprise witness"—to the State. He admitted on the stand that he had pleaded guilty to robbing the Knobnoster bank, but denied that he had robbed it. On defendants' motion his testimony as to the plea of guilty was stricken out. He further testified that by prearrangement he had met appellants in Kansas City on the morning of March 15, 1928 (hour not stated), and that the three went from there to Windsor, but did not go through Knobnoster; that their reason for going to Windsor was that Blackmore said his father wanted to buy a car. He admitted making to the prosecuting attorney a written statement which, however, the State was not allowed to introduce.

Defendants called several witnesses living in Kansas City where defendants resided at the time of the robbery. The testimony of these witnesses tended to show that both defendants were in Kansas City, about seventy-five miles from Knobnoster, about eight o'clock A. M., on March 15, 1928. By most of them the time was estimated rather than definitely fixed. One of the witnesses, Blackmore's landlady, testified that on the night of March 14, Blackmore asked to be called a little earlier than usual the next morning. Several of these witnesses testified that Blackmore's reputation for honesty and as a law-abiding citizen in the community in which he lived was good. ' He was shown to have lived in Kansas City eight or ten months prior to the date of the robbery.

Both appellants took the witness stand and each testified, in answer to a direct question of his counsel, only that he did not rob the bank or have anything to do with the robbery. Dr. Blackmore, father of defendant Blackmore, was in the court-room, but was not called, nor was any witness called to prove that either appellant was in Windsor that day.

I. We have set out rather fully the evidence tending to identify and point to appellants as participants in the robbery, because of their urgent insistence that the evidence is insufficient. After careful consideration we are of the opinion that it was sufficient to make that question one for the jury, and that the learned trial court did not err in refusing to direct a verdict of not guilty. It is true that no witness positively identified either defendant as one of the men seen at the robbery. Caldwell almost did so. As to each defendant other witnesses said he looked like one of the men and the witness believed he was one of them. Such testimony, based upon the observation of the witness and coupled with a description of the person sought to be identified and the circumstances, is competent and its probative value is for the determination of the jury.

In State v. Carolla, 316 Mo. 213, 226, 292 S. W. 721, we thus stated the rule, quoting from 16 C. J. 750, sec. 1537:

"Provided he bases his testimony on his own knowledge and not on information furnished by another, the opinion, belief, judgment, or impression of an ordinary witness as to the identity of a person or an object is competent evidence."

In State v. Howard, 118 Mo. 127, 141, 24 S. W. 41, it was said:

"It is not necessary to the identity of persons, or of handwriting, or of other things, that the identifying witness should swear pointedly to such identity; it is sufficient that the witness swear to his belief that the person or thing is the same. A jury will be authorized to return a verdict of guilty, although the witness will not swear positively to the identity of the prisoner with the guilty party; if the witness swears 'he resembles him,' the testimony should go to the jury, and its sufficiency is exclusively for their determination; its competency is beyond question." Citing State v. Babb, 76 Mo. l. c. 504-5.

In the Howard case, however, there was some testimony positively identifying the defendant.

The same doctrine as to the competency and sufficiency of testimony that the witnesses believed a person they had seen under stated circumstances to be the defendant was recognized by this court in State v. Franke, 159 Mo. 535, 60 S. W. 1052, in which Commonwealth v. Cunningham, 104 Mass. 545, was approvingly cited and quoted from. In the Cunningham case the testimony relative to identification is thus stated:

"The witnesses called by the Commonwealth testified that they saw a man driving off the stolen wagon on the day the theft took place; that they did not notice that the man had an 'imperial;' and that a few days afterwards they separately and without any suggestion picked out the prisoner from among others in the station-

house, as the man they thought they saw on the wagon; but that they were not positive, as the prisoner had then an 'imperial' and different clothes; and that they would not swear that the prisoner was the man they saw on the wagon; but that he resembled him.''

On that testimony the conviction was upheld. The court held the evidence competent; that it could not be said it had no tendency to convict the defendant and that its sufficiency was to be estimated and weighed exclusively by the jury; that ''it is not necessary that any one witness should distinctly swear that the defendant was the man, if the result of all the testimony, on comparison of all its details and particulars should identify him as the offender. The principle which allows evidence to go to the jury necessarily involves a right, on their part, to believe it, and if its effect upon their minds should be to prove the defendant's guilt beyond reasonable doubt their verdict will be rendered accordingly.''

Commonwealth v. Cunningham, supra, is also cited with approval in State v. Cushenberry, 157 Mo. 168, 56 S. W. 739. That such evidence is competent and its weight for the jury, see also Greenwell v. Crow, 73 Mo. 638; State v. Weber, 156 Mo. 249, 56 S. W. 729; 1 Greenleaf on Ev. (16 Ed.) sec. 440; Starkie on Ev. (10 Ed.) 173; State v. Hopkirk, 84 Mo. 278; State v. Powers, 130 Mo. 479, 56 S. W. 984; State v. Riddle (Mo.), 23 S. W. (2d) 179; State v. Higgins (Mo.), 278 S. W. 977; State v. Bray (Mo.), 246 S. W. 921.

In State v. Riddle, supra, the only identification of the defendant at the scene of the robbery was by one witness who thus identified him by his voice: ''His voice was familiar to me and to the best of my knowledge it was his voice.'' With certain circumstantial evidence insufficient in itself that identification was held sufficient.

In State v. Bray, supra, the robber had a mask over his eyes, but his mouth and chin were exposed, by which and by his general form the prosecuting witness testified he identified him. The conviction was sustained.

Identification by witnesses of a person they have seen but once before, perhaps in a moment of excitement, is necessarily more or less a matter of opinion. Some witnesses will express that opinion in the form of a positive conviction, perhaps feel convinced, while others more conservative will only express a belief. The triers of the facts, in the light of all the circumstances and evidence, must determine the question.

There were other circumstances to be considered. The bandits' car was abandoned about six miles southeast of Knobnoster. The evidence warrants the finding that there were three men in it. Those men must have left that point in another car, previously there provided. Tracks of another car going south from that point were followed until obliterated by falling snow. Farther south and soon

thereafter these two appellants and Jones, riding in a Ford car and giving indications of haste were recognized at the Goring and Miller homesteads. They took the witness stand, but contented themselves with the bare denial that they robbed the bank, offering no explanation of their presence under the circumstances shown at the Goring or Miller houses at a time near enough that of the robbery to indicate that they were fleeing from the scene thereof. They offered testimony of other witnesses tending to show that they were in Kansas City about eight o'clock that morning, according to the estimates of the witnesses, but did not themselves testify when or in what conveyance they left there. When a defendant testifies and fails to deny incriminating evidence such failure is legitimate matter for the State's counsel to comment upon in argument, necessarily therefore a circumstance which the jury may consider in weighing the evidence. As to the alibi evidence the accuracy and weight of that was for the jury. We think there was substantial evidence to sustain the verdict of guilty.

II. Appellants' second complaint is that certain questions propounded by the prosecuting attorney to two of appellant Blackmore's character witnesses prejudicially affected appellants' rights.

Mrs. Roupe had testified that Blackmore's reputation for truth and honesty and as a law-abiding citizen was good. On cross-examination she was asked if she had not heard rumors that he was suspected of having robbed the Bank of Kingsville prior to March 15, 1928. Defendants' counsel objected, stating that that bank was not robbed prior to March 15. Counsel for the State thought it was and the witness was permitted to answer the question. She said she had heard no such rumors. Another character witness was asked a similar question on cross-examination. It was objected to on the same ground, whereupon the prosecuting attorney stated that he had investigated and learned that the Knobnoster robbery did come first; that he had been wrong about that. The court said: "Very well, then, don't ask that question again." It was not repeated. The question was not answered. No request was made of the court for any further ruling or action and no exceptions were saved to the court's ruling or failure to rule or to act further. Defendants seemingly were content with what the court had done. In those circumstances the matter complained of is not presented for or open to review here. [State v. Woolsey, 33 S. W. (2d) 955, and cases cited therein.]

III. Counsel for the State, in his argument to the jury, referred once to defendant Blackmore as "that malefactor of great wealth."

Defendants' counsel objected to the term "malefactor." The court admonished counsel for the State to stay within the record, in effect sustaining defendants' objection. No request was made for a reprimand or for any further action by the court. For reasons given in Paragraph II, error cannot be urged because of this episode.

Counsel for the State further said in argument: "Gentlemen, if the State has proven the guilt of these men you should convict them and, gentlemen, I believe they have." Objection was made to the attorney's statement of what he believed, coupled with a request for a reprimand. The court said: "Yes, what the attorney believes not based upon the evidence is immaterial." "To which action of the court" defendants objected and excepted. It does not appear that defendants' exception was to the court's failure to reprimand or to the insufficiency of the rebuke. The prosecutor's statement did not indicate that his expressed belief was based on information outside the evidence. It showed clearly that he was expressing a conclusion or opinion drawn solely from the facts in evidence and was not improper. [State v. Midkiff (Mo.), 278 S. W. 681, 683; State v. Hart (Mo.), 237 S. W. 473, 480.] Even if improper we could not say, in view of the court's admonition, that it constituted reversible error. State v. Smith (Mo.), 281 S. W. 35, 40, and cases cited.]

It may be further stated that we do not deem any of the matters discussed in paragraphs II and III hereof so prejudicial as to justify reversal of the judgment even had further reprimand or other action been requested of the court and denied.

Other assignments of error in the motion for new trial have been abandoned. Moreover, we find them without merit.

The information, verdicts and judgments are in due form and sufficient. Defendants were fairly tried and we find no prejudicial error in the record. The judgment of the circuit court as to each defendant is affirmed. *Davis, C.,* concurs; *Westhues, C.,* not sitting.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.