STATE of Missouri, Plaintiff-Respondent,

v.

Thomas Russell MAXWELL, Defendant-Appellant.

No. 34802.

Missouri Court of Appeals,
St. Louis District,
Division Two.

Sept. 18, 1973.

Motion for Rehearing or Transfer Denied
Nov. 13, 1973.

Application to Transfer Denied
Jan. 14, 1974.

David Uthoff, Asst. Pub. Defender, Thadeus F. Niemira, William R. Kirby, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Jefferson City, G. Michael O'Neal, Asst. Atty. Gen., J. Brendan Ryan, Circuit Atty., James J. Barta, Nels C. Moss, Jr., William M. Frain, Jr., Frederick Dana, Asst. Circuit Attys., St. Louis, for plaintiff-respondent.

KELLY, Judge.

Thomas Russell Maxwell was charged by an amended information with Robbery First Degree by means of a dangerous and deadly weapon. In addition to the charge for which he was on trial the amended information alleged that he had previously been convicted of a felony, to-wit, Stealing from a person. Section 556.280 R.S.Mo. 1969, V.A.M.S.[1] Trial was had by a jury, and the only issue submitted to the jury was whether he was guilty or innocent of the charge of Robbery in the First Degree by means of a dangerous and deadly weapon, the appellant having stipulated as to the alleged prior conviction and the trial judge made the required finding thereon.

Appellant was charged in the amended information along with two others, Lawrence James Watson and Ronald R. Massey. The charge was that the appellant, Watson and Massey, by means of a dangerous and deadly weapon, to-wit, a knife, on the 26th day of May, 1971, did rob Wilford Woodard of $4.00, one men's wallet of the value of $3.00, and three car keys of the value of $0.75.

Prior to trial appellant's counsel filed a motion to suppress evidence taken from appellant and also a motion to suppress evidence relative to a confrontation of the victim of the crime with the appellant and

---

[1]. All statutory references are to R.S.Mo.1969.

his two co-defendants a short time after the alleged robbery under circumstances he contends were unduly suggestive so as to taint the victim's in-court identification. After an evidentiary hearing each of these motions to suppress were overruled.

On appeal, the following points are presented for review:

1. the State failed to sustain its burden of proof that the appellant was guilty of the charge in that (a) the trial court erred in failing to sustain his motions to suppress evidence, (b) the trial court erred in admitting into evidence the in-court identification of the defendant in that it was based upon "tainted" suggestive evidence and circumstances violative of appellant's constitutional rights, and (c) the victim's identification was against physical facts and self-destructive;

2. the trial court erred in giving and reading to the jury Instruction No. 3, the burden of proof instruction;

3. the trial court committed prejudicial error in admitting into evidence testimony of Officer Schulze relative to an extra-judicial consistent statement made by the victim on the night of the occurrence; and

4. the punishment assessed by the trial court, to-wit, 20 years, is so severe and unconscionable as to constitute cruel and unusual punishment and to demonstrate bias and prejudice of the trial court.

Appellant's "Motion to Suppress Evidence" was directed against the evidence seized from the appellant at 1261 St. Ange Court, to-wit, a knife; it is his contention that the arrest of the appellant was unlawful and not based upon "probable cause" and therefore the search and seizure was illegal. His Motion to Suppress the evidence of an "impromptu lineup" conducted by the police at 1261 St. Ange Court was based upon unspecified rights under the 4th and 14th Amendments to the United States Constitution, his privilege against self-incrimination, and his right to counsel as guaranteed by the 5th, 6th and 14th Amendments to the United States Constitution. Prior to trial evidentiary hearings were conducted on two separate occasions, one for each motion, by two different judges.

With reference to the Motion to Suppress evidence seized as a result of the search at the time of appellant's arrest, the arresting officers had received a radio transmission at approximately 12:22 a. m., May 26, 1971, that "three Negro male subjects" were wanted for a robbery at 1037 Park Avenue and that they had made their escape in the victim's "tan 1962 Buick." The officers drove to 14th and Morrison Streets where they observed a tan 1962 Buick sitting in a parking lot and occupied by three Negro males, all sitting in the front seat. The officers continued observing this tan 1962 Buick and its occupants for "a few moments" when two of the occupants thereof exited from the driver's side of the car and the third from the passenger side of the car. The one who got out of the passenger's side of the car walked east across the parking lot a few feet and at that time the officers pulled their vehicle up behind the Buick, alighted and approached the men. One of these officers, Officer Seale, arrested the man identified as Watson who had walked to the east from the passenger side of the parked Buick auto. As Seale approached Watson, Seale observed that Watson stooped down and tossed something into the bushes nearby. After advising Watson that he was under arrest, Officer Seale searched the bushes where he found a brown man's wallet. He immediately searched Watson's person and found in the lower left front coat pocket a Shoppers' Credit Card with the name of Mr. Woodard on it. The arrest was made at about 12:45 a.m. It was admitted that prior to the arrest the description broadcast over the radio did not include a license number, what the three "Negro Male suspects" were wearing, a description of their age, their height nor whether the Buick was a two or four door car. Officer Cramer,

who did not testify at the hearing on the motion to suppress the evidence, placed appellant under arrest and found a Sabre brand knife on his person. Both Watson and appellant had been placed under arrest suspected of this robbery prior to their search, although neither officer had an arrest warrant nor a search warrant at the time.

Appellant was, at that time, represented by counsel other than trial counsel, and in deciding whether the judge who heard the evidence with respect to this motion correctly decided the legal principles at issue we must look to the quantum of evidence produced at that time, much of which is hearsay brought into the record by appellant's counsel at the time of the evidentiary hearing. According to Officer Seale, appellant was arrested at the driver's side of the 1962 tan Buick and was searched there by Officer Cramer. Appellant was arrested "Suspicion of Robbery" and Officer Cramer found a Sabre brand pocket knife with a four inch blade on appellant. With the record in this condition the judge hearing the motion overruled it.

■ Reduced to its simplest form, the real issue is whether the police officers had reasonable cause to place appellant and the other two "Negro males" under arrest without a warrant. The answer to this question hinges on whether they had probable cause to make the arrest, for if they did, then the search was incidental to a lawful arrest and would not be improper. Probable cause consists of the facts available to officers at the moment of the arrest, and whether at that time such facts would warrant a man of reasonable caution in believing that an offense had been committed, and whether at that time the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man into believing that the movant had committed or was committing an offense. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

■ It is the movant who has the burden of presenting evidence to sustain his contentions that the search and seizure was unlawful. State v. Caffey, 457 S.W. 2d 657, 659 [3] (Mo.1970); State v. Fields, 442 S.W.2d 30, 33 [3] (Mo.1969); State v. Holt, 415 S.W.2d 761, 765 [2] (Mo.1967). While it is basic that an arrest without a warrant must stand upon firmer ground than mere suspicion, Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963), the existence of probable cause justifying an arrest without a warrant is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. "It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense involved." 5 Am.Jur.2d, Arrest, § 48, p. 740, Beck v. Ohio, supra, State v. Martin, 465 S.W.2d 594, 596 [1] (Mo.1971). State v. Harris, 477 S.W.2d 42 (Mo.1972) held that an arrest was supported by probable cause where the fact that an unfamiliar tan station wagon had been seen parked in a driveway of burglarized premises, that guns were discovered to have been taken from the burglarized premises, and information that the car was thought to be proceeding east on Route 66 possibly in St. Louis County was broadcast over the police radio, was heard by a State Trooper who saw what he believed to be a tan 1962 Plymouth station wagon going north on Highway 244 and who then pursued it and overtook it when it had a flat tire and was forced to pull off onto the shoulder of the highway. The Trooper then ordered the three occupants of the station wagon out of the car and placed them under arrest. While looking into the windows of the station wagon he observed therein what appeared to be guns covered by a bedspread. The station wagon was taken to Troop C Headquarters and 12 guns, a bedspread and a blanket were taken from the station wagon. The Court, l. c. 46 [5], said:

"Without restatement, the facts above detailed, leading to the apprehension of

appellant, clearly provided reasonable cause for his arrest and for the search of the vehicle in which he was travelling."

Also see State v. Ward, 457 S.W.2d 701, 705 [2–6] (Mo.1970) and State v. Dodson, 491 S.W.2d 334, 336 [1–3] (Mo. banc, 1973) where this issue is discussed in detail, and authorities are gathered. We rule this contention against the appellant.

Appellant's next contention is that his motion to suppress evidence of "an impromptu line-up" conducted in the vicinity of 1261 St. Ange Court should have been sustained, and that the trial court erred in failing to sustain this motion. Here again, however, we must, in deciding this contention, view the evidence in support of the motion, and the evidence upon which the trial court based its ruling, to make a determination whether the trial court erred.

The record of the evidence offered at the evidentiary hearing on the motion to suppress the one-on-one confrontation consists of the testimony of two witnesses: the victim, Mr. Woodard and Officer Ronald Seale. Because of the nature of appellant's contention with respect to the one-on-one confrontation, its suggestiveness, and the independent basis for the in-court identification of Mr. Woodard, it is necessary to detail the evidence proffered at the evidentiary hearing on the motion.

Mr. Woodard testified that on May 26, 1971, at around 12:15 a. m. he drove his tan 1962 Buick to the corner of 11th and Park Streets in the City of St. Louis, Missouri, where the Red Top Tavern is located. He pulled up to the curb of 11th Street facing northwardly and brought his car to a stop near the corner, and as he did so he did not see anyone standing around the tavern or at the corner or on the street any place. As he sat in the front seat of his car on the driver's side he was looking northwardly when he became aware of the presence of three men, one right beside the driver's side of his car. He did not know where they had come from. One of these men—the appellant—opened the door on the driver's side of the car, thrust a knife blade against the middle of his throat and "immediately afterwards" told him: "Shut your eyes and don't open them or I will slit your throat." The man with the knife had his hand over Mr. Woodard's left shoulder as he put the knife against Mr. Woodard's throat and made the threatening statement. While the knife blade was held against the middle of his throat, Mr. Woodard turned his head to the left so that he could see that the knife held against his throat was "a long knife" and only a part of the handle was covered by the hand of the man holding it. About half of the handle of the knife was exposed and he could see that the handle was white, the blade was four or five inches long, and the knife was of a type which folded up. One of the men ordered him to lie down and he did so, all the while with his eyes closed. As he lay on the front seat of the car, one of the men took a billfold out of his pocket, and then, after the knife had been taken away from his throat, he was dragged out of the car and his car was driven from the scene. Once he closed his eyes he did not open them again until after the robbers had driven from the scene, and he did not know who, or how many of the men, were in the front seat of the car, or if there was one or more of them in the back seat. He could not tell the court whether any one of the three men was wearing a hat, a jacket, eyeglasses, the height nor weight of any one of them, nor the color of any of the clothing they were wearing at the time the robbery was committed. After the robbers made their getaway, Mr. Woodard went into the Red Top Tavern and the police were called. When the police arrived he did not give them any description of the three men, tell them that a knife had been used in the robbery, nor give them the license number of his car. The only description of the three men which he gave the police at the scene was that the three men were "Black." The transcript of the preliminary hearing

(which is a part of the record on appeal) was referred to by appellant's counsel and the following questions and answers read to Mr. Woodard:

"Q. Do you know which one had the knife?

A. The one in the green shirt.

Q. The one with the khaki shirt?

A. Yes, sir."

While it was not developed at the evidentiary hearing on the motion to suppress the evidence of the one-on-one confrontation, the transcript of the preliminary hearing shows that the leading question changing the identification of the one who had the knife from "one in the green shirt" to "The one with the khaki shirt" was asked by the assistant circuit attorney conducting the interrogation of the witness, and all three of the accused were present at the preliminary hearing on the complaint for which appellant and the other two were jointly charged. Mr. Woodard's response to the next question at the evidentiary hearing on the motion: "Do you remember making that statement?" was "A. No, sir. I guess I did though." However, except by implication, no evidence was offered to show whether it was the appellant who was wearing the "green shirt" or the "khaki shirt" at the preliminary hearing, and thus the apparent conflict in testimony loses some of its impact. No questions were asked relative to the one-on-one confrontation of Mr. Woodard by either the movant-appellant nor by the assistant circuit attorney.

The second and final witness at the evidentiary hearing was Officer Ronald Seale, called by the appellant. He testified that at about 12:22 a. m. on May 26, 1971, he received a radio report of an automobile stolen from 11th and Park Avenues in the City of St. Louis. The radio transmission was: "Three Black male subjects wanted for a robbery operating the victim's 1962 tan Buick." The message did not contain a license number of the Buick nor any physical description of the suspects other than that they were "Black male subjects." He and his partner, who were in the vicinity of Ninth and Park Streets when they received the radio transmission, drove the police vehicle they were in past the scene of the reported robbery, did not stop, and proceeded to the "project area" at Morrison Lane, a distance of about 4 blocks from the scene of the robbery. As they approached the parking lot located at Morrison Lane and St. Ange Court and after they had brought the police car to a stop approximately 25 feet east of St. Ange Court, they observed a tan two-door Buick parked in the west section of the parking lot. This was now about 12:40 a. m. Officer Seale and his partner sat there for a matter of minutes observing the Buick with three Black males sitting in the front seat and then pulled the police vehicle up behind the tan Buick. As the police officers pulled up to the rear of the Buick they observed two white wall tires were lying on the pavement of the parking lot at the rear of the Buick. In the meantime, two of the men had alighted from the driver's or left side of the Buick and remained standing by the door from whence they had just come; the third man, who had stepped out of the passenger side of the Buick, walked around the car and went to the center of the parking lot. The two men standing by the left door of the car, as well as the third man who had walked away from the car were placed under arrest and handcuffed.[2] He advised them of their right to counsel and gave them the Miranda warnings. They declined the services of counsel. At his request, Mr.

---

**2.** It is not clear from the testimony at the pretrial hearing as to which officers arrested which of the men at the parking lot incident. However, reference to the testimony at the motion to suppress the evidence seized at the scene of the arrest and further to the evidence taken at the trial shows that Officer Seale was not the police officer who arrested Maxwell and the other man standing by the Buick; that arrest was effected by Patrolman Klingler.

Woodard was brought to the scene of the arrest within a short time, and when he arrived there the three men were still handcuffed and standing just to the north of the rear of the Buick automobile. Neither Officer Seale nor his partner asked Mr. Woodard if these were the three men who held him up.

At the evidentiary hearing there was no evidence that Mr. Woodard did, in fact, identify the three men in custody as the robbers. The evidence was directed more at the circumstances of the perpetration of the crime and the question of the whether he had a sufficient view of the appellant to identify him at any time. The judge presiding at this evidentiary hearing found, from the totality of the circumstances, that the lineup was not so unnecessarily suggestive and therefore overruled the motion.

▆▆▆ The case law in this State which has held that it is not improper for the police to immediately return a freshly apprehended suspect to the scene of the crime for identification by one who has seen the culprit minutes before is too well settled to require much discussion, and the public policy supporting the reasoning behind the decisions too often enunciated to bear repeating. State v. Hamblin, 448 S.W.2d 603, 610 [9] (Mo.1970).

This general rule is, however, subject to inquiry whether the confrontation was "unnecessarily suggestive and conducive to irreparable mistaken identification." If, after an evidentiary hearing, the court concludes it was, it must then extend its inquiry and determine whether the confrontation so tainted the identification that it must be excluded from in-court testimony. State v. Richardson, 495 S.W.2d 435, 438 (Mo. banc 1973); Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280, 1284 [6] (1969) cert. den. 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245.

The evidence relative to the post-arrest confrontation at St. Ange Court and Morrison Lane presented on the motion to suppress that evidence was that Mr. Woodard was brought to the scene of the arrest ostensibly for the purpose of identifying the tan Buick automobile found on the parking lot there. Upon his arrival he saw not only his car, but three Black males, handcuffed and in police custody, standing near his "stolen" automobile. Except by implication, there was no evidence developed in this hearing that Mr. Woodard made any identification at that time, and the judge made no finding that there was an identification. His finding was limited only to the conduct of the confrontation.

▆▆▆ The mere fact that the three men were handcuffed and in the custody of the police would not constitute the line-up "unduly suggestive or unfair." In State v. Dodson, 491 S.W.2d 334, 338 (Mo. banc, 1973) a confrontation between a young Negro in police custody while handcuffed and the three victims of a robbery, within 30 minutes of the perpetration of the crime on the parking lot where the robbery took place, was held to be not unduly suggestive or unfair. The court found that the presence of the victim's stolen auto, which was used as the get-a-way car by the "three black male subjects," in the immediate vicinity of where the confrontation took place also did not render the confrontation suggestive nor unfair. Viewing these circumstances within the context of the record at that time, we are unable to conclude that there was error in his findings, and must therefore reject appellant's contention that the ruling on the motion to suppress was prejudicially erroneous.

Having concluded that on the basis of the evidence before him, the trial court correctly ruled that the confrontation was neither unconstitutionally suggestive nor unfair, we need not therefore consider whether there was an independent basis for the in-court identification. That issue should have been decided during the course of the trial and in the posture of the evidence at that time.

However, appellant would have us go one step further and make a determination whether under the circumstances of the commission of the crime the victim was in a position to make the observations necessary to form an identification image of the appellant, and, in view of all the evidence in the record at the end of the entire case, there was sufficient credible evidence to support a conviction of the crime charged. It is his contention that de hors the "suggestive" confrontation of the appellant in handcuffs with two other "black male subjects," in custody of the police, and in the immediate vicinity of his stolen car, the victim could not have made an identification of the appellant as the man holding the knife against his throat at the scene of the robbery. He contends that the identification was in fact the combination of the circumstances at the parking lot and not the independent identifying image formed by the victim during the course of the robbery. In support of his position he contends that the testimony of Mr. Woodard was "inherently incredible or self-destructive, or opposed to known physical facts" and lacks probative value. He argues that it is against physical facts that Mr. Woodard, with a knife touching his throat, would turn his head sideways to look at the holder of the knife without being cut or scratched. To further bolster his contentions, he argues that Mr. Woodard testified that prior to the parking lot confrontation he was unable to describe his assailants other than to say they were three Negro males; he could not describe them as to weight, height, color of eyes or any particular identification. He did not know whether they were wearing hats or glasses, nor could he describe the type of clothing any one of them was wearing. For this reason, he contends, his objection to the admission of the identification at the time of trial on the basis that there was no foundation laid for its admission should have been sustained.

It has been said: "(The) Most basic requirement of the trial of an accused is that he be shown to be the person who committed the offense. From the innumerable cases on 'identification,' it is obvious that the courts jealously guard against any chance of error [in this respect]. For this reason, even the approved investigative methods, be it confrontation or photographic comparison, may be found improper if so 'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" State v. Parker, 458 S.W.2d 241, 243 (Mo.1970). The court in State v. Holt, 465 S.W.2d 602, 604–605 (Mo.1971) said: "As in other *face-to-face robbery cases,* the events at the time of the robbery, even·though the time of confrontation is short, are indelibly etched in the victim's mind." (Emphasis supplied).

In all instances the issue of identification is for the jury to decide and trial and appellate courts may not delve into a determination of the weight of the evidence in such circumstances.

Appellant's defense in this case was alibi. His explanation of his present at the scene of the arrest is that he had left his home at 12:30 a. m. on the 26th day of May, 1971, to go a White Castle hamburger restaurant on 14th and Chouteau Streets to get coffee and some hamburgers for his sister. After he came out of his house he saw his co-defendant, Massey, going through the glove compartment of a car, and his other co-defendant, Watson, was standing at the trunk of the light colored car. Massey called him over to the car and when he arrived there he asked Massey, "How are you doing?" or "What you all doing?" He no sooner got these words out of his mouth than the police came in from each direction. He denied he had ever entered the car, that he had been at the scene of the crime, and that he had participated in the robbery of Mr. Woodard. He admitted that the knife found in his pocket and introduced into evidence as the robbery weapon belonged to him and was taken from him at the time of his arrest. He said he carried it for his own protection. According to appellant,

the police (he did not identify which police officer—he was not asked by either counsel) said to Mr. Woodard upon his arrival at the arrest scene: "Well, here's the ones that robbed you; here's the three who robbed you." According to appellant, Mr. Woodard replied: "Yes, sir, that's them. That's them. All of them." He further testified that one of the police officers told Mr. Woodard: "We got this off Maxwell, the first victim (sic) you see standing over there."

Other witnesses appeared on behalf of the appellant and corroborated portions of his testimony. The jury chose not to believe the appellant and his witnesses; this it had the right to do. The transcript reveals apparent conflicts in Mr. Woodard's testimony but these were fully devloped by cross-examination of the witness during the trial by appellant's counsel.

 The rule in Missouri is that a judicial or extra-judicial identification by a witness is competent evidence for the jury to consider. State v. Sigh, 470 S.W.2d 503, 505 (Mo.1971); State v. Blackmore, 327 Mo. 708, 38 S.W.2d 32, 34–35 (1931). To lay a foundation for the receipt into evidence of identification testimony it is sufficient that the witness testify as to his belief regarding the identity of the person provided his belief is based upon personal observations. State v. James, 194 Mo. 268, 92 S.W. 679, 682 (1906); State v. Cushenberry, 157 Mo. 168, 56 S.W.2d 737, 742 (1900). The competency of identification testimony is not affected by the witness' failure to testify positively to the identity. State v. Blackmore, supra. The triers of the facts must determine the question in light of all the circumstances and evidence. State v. Carey, 486 S.W.2d 443, 446 [4] (Mo.1972). In commenting on the admissibility of a judicial or extra-judicial identification by a person testifying at trial, the Court in State v. Sigh, supra, 470 S.W.2d l. c. 505 said: "In Stovall [Stovall v. Denno] (388 U.S. 293, 299–300, 87 S.Ct. 1967, 1971, 18 L.Ed.2d 1199), the Court noted that

the 'overwhelming majority of American courts have always treated . . . (this) evidence question not as one of admissibility but as one of credibility for the jury.' "

We hold that in the light of Mr. Woodard's testimony it was a matter for the triers of the facts—the jury—to make the determination appellant would have us make as a matter of law, and we therefore rule this contention against him.

Appellant's next contention is that the admission into evidence of the testimony of Patrolman Schulze as to what Mr. Woodard related to him upon his arrival at the Red Top Tavern concerning the events of the robbery and that Mr. Woodard identified the three men at the post-arrest confrontation constituted prejudicial error. Appellant contends this evidence was inserted into the case by the State in an effort to fortify its case because of the improbability of Mr. Woodard's testimony, because it was contrary to the physical facts and to lend credibility to his testimony. He did interpose an objection to the statement made at the Tavern on the basis that is was hearsay, but acknowledges that he did not interpose an objection to the testimony concerning the post-arrest identification by Mr. Woodard. He attempts to avoid any waiver which might have resulted thereby in arguing that once an objection is made which explicitly presented to the trial court the issue, and, the objection being overruled, it was not essential that the party interposing the objection thereafter repeat the objection each time the other party seeks to elicit like testimony to preserve his record for review.

It is the State's position that the testimony was admissible on two grounds: 1) it was not offered for the truth of what was said, but rather to explain the conduct of the investigating officer and why he took Mr. Woodard to the post-arrest scene on the parking lot; that the appellant questioned the propriety of the identification and whether there was probable cause for the arrest; 2) that, even if the evidence

was offered for the truth of what was said, during cross-examination of Mr. Woodard the appellant attempted to elicit the fact that he did not tell the police about a knife being used in the robbery until after he had identified the appellant and had been shown the knife by the police.

■ This point actually presents two separate evidentiary problems. The first is concerned with the police officer relating at trial during the prosecution's case in chief what was told to him by the victim out of the presence of the defendant. The rule in this State is that details of extra-judicial statements made by a prosecuting witness in making complaint are admissible in evidence to rehabilitate the credibility of the witness *after testimony establishing extra-judicial statements by the witness contradict the witness' testimony at the trial has been introduced for impeachment purposes.* State v. Fleming, 354 Mo. 31, 188 S.W.2d 12, 16 [7] (1945). Absent the introduction of evidence to establish statements contradicting the testimony given by the witness, impeachment resulting from mere cross-examination is insufficient to render admissible prior extra-judicial consistent statements; and even though the witness be impeached by prior inconsistent statements, extra-judicial prior consistent statements on subject matters foreign to that on which the witness was impeached remain incompetent and inadmissible. State v. Fleming, supra, 1. c. 16.

The evidence complained of was presented in the State's case in chief, not in rebuttal, and was adduced by the assistant circuit attorney during direct examination of a witness offered by the State. During cross-examination of Mr. Woodard, appellant's counsel interrogated him concerning the time when he first advised the police that a knife was involved in the perpetration of the robbery. Mr. Woodard replied that this took place en route to the arrest scene. Later he was asked if he was telling the jury that with the knife "up against his Adam's apple" he could look down and see that it was a pearl-handled knife. He re-plied that he could see it. Further, during the course of cross-examination, appellant's counsel established that Mr. Woodard had been interviewed by two men on October 11, 1971, at Walter's Bar, but he denied that he told them that the knife had some writing or an emblem on it. On re-direct examination in response to a question put to him by the assistant circuit attorney he denied telling these two men who interviewed him on October 11, 1971, anything. He further testified that they identified themselves as being from the Circuit Attorney's Office, but denied giving them any statement or signing anything for them. He said that when they attempted to interview him he told them he just didn't want to discuss it.

With the case in this posture, the next State's witness was Patrolman Carl Schulze, and very shortly after his interrogation commenced, the assistant circuit attorney asked:

"On that particular date, did you have occasion to go to 1340 South 11th Street?

A. Yes, we did.

Q. And whom did you meet there?
A. We met Wilford Woodard there.

. . . . . .

Q. All right. Did you talk to Wilford Woodard?

A. Yes, I did.

Q. And where did that take place?

A. In the Red Top Tavern located at 1037 Park.

Q. And where was he in the tavern when you arrived?

A. He was standing along the west wall by the cigarette machine.

Q. And what, if anything, did he tell you?

A. He told us that he parked his car at —on 11th Street there, at 1340 11th

Street, about twelve fifteen a. m., and three Negro males—

MR. KIRBY: I want to object to this, Your Honor, on the grounds it's all hearsay.

MR. DANA: It's already been testified to.

THE COURT: What's that?

MR. DANA: It's already been testified to. It's not hearsay.

THE COURT: Overruled.

Q. (BY MR. DANA) Go ahead, Officer.

A. And he stated that he parked—that he pulled up to the the curb at twelve fifteen a. m. and he was met by three Negro males. He couldn't determine from which direction they came, but they opened up his door by the driver's side and one of the Negro males held a knife to his throat. He described the knife as a white pearl-handled knife and the blade was about four to five inches long; and the subject said to him, "Shut your eyes and keep your mouth shut or I'll slit your throat;" and he told us then that he did shut his eyes and after he shut his eyes, he heard one of the subjects say "I have a gun and I'll kill you if you say anything." So, in the meantime, the one with the knife reached in his front pocket and pulled out four one dollar bills.

Q. From whom?

A. Oh, from Mr. Woodard, Mr. Woodard.

Q. O.K.

A. And then he reached into the right rear pocket and pulled out a brown leather wallet which contained some personal papers and two charge plates.

Q. And did he tell you if anything else was taken?

A. He said that they pulled him out of his car and they all got into his car and went north on 11th Street to the first alley between Park and Rutger, and then they went west in the alley out of sight."

. . . . . .

"Q. Did you do anything with Mr. Woodard that particular night?

A. Well, we set him in the car, in our patrol vehicle, and we placed a description on the air.

Q. What was the description?

A. Wanted for robbery from that location, three Negro males, last seen driving west in the alley between Park and Rutger in the victim's 1962 tan Buick.

Q. And what happened after that?

A. Sometime later then we received a call from another patrol unit that they had the subjects at 1261 St. Ange, which is about four blocks from that location.

Q. Take Mr. Woodard to that scene?

A. Yes, we did.

Q. All right. What happened then?

A. He identified the subjects as the same ones that held him up . . ."

It was error for the trial court to admit into evidence during the State's case-in-chief and over the appellant's objection Patrolman Schulze's testimony set out hereinabove.

However, not all trial error is so prejudicial as to require a reversal; harmless error is not grounds for reversal. But error in admission of evidence should not be declared harmless unless it is so without question. State v. Degraffenreid, 477 S. W.2d 57, 64 [14] (Mo. banc, 1972). The Court in Degraffenreid, l. c. 65, said: "We also are mindful that error which in a close case might call for reversal may be disregarded as harmless when the evidence of guilt is strong."

In making a determination whether the error in this trial was harmless, we note that appellant's theory of defense was alibi and the incredulity of the victim's identification testimony. At no time was the defense that the robbery never occurred; it was simply that if it did occur this appellant did not participate in it because he was elsewhere at the time. We therefore conclude that the error in so far as the hearsay testimony with respect to Mr. Woodard's report of the manner in which the robbery occurred was harmless and merely corroborative of a fact not in issue.

When we consider the hearsay evidence relative to Mr. Woodard's description of the knife to Officer Schulze, we are confronted with a more difficult question. Throughout cross-examination of the victim, appellant's counsel attempted to cast doubt upon the ability of the victim to observe and accurately recall the basis upon which to make a valid identification of the appellant as one of the three culprits who perpetrated the robbery on him, except as that identification was, in fact, the product of the post-arrest confrontation on the parking lot at St. Ange Court and Morrison Lane and not on an image of identification formed at the scene of the crime. This was effectuated by cross-examination of Mr. Woodard to the effect, 1) that he was mistaken with respect to the date and time of day he had testified that he had returned home from his aunt's funeral; 2) that he had been drinking intoxicants throughout the day, until he left one tavern—Walter's Tavern—for the purpose of going to another—the Red Top Tavern—to continue his imbibing; 3) that when he arrived at the corner of 11th and Park Streets, where the Red Top Tavern was situated, he laid down and fell asleep and was thereafter suddenly awakened by the knife thrust against his throat and the threat that unless he closed his eyes and kept them closed his throat would be slit; 4) that he immediately closed his eyes and kept them closed until the robbers made their getaway in his car; 5) that his testimony that he got a view of the knife held against his throat was incredible and was the product of being shown the knife taken from the appellant at the time of his arrest and shown to Mr. Woodard at the scene of the arrest; and 6) that under all the facts his identification of the appellant as one of the robbers was without a sufficient foundation. Mr. Woodard, in his answers to these questions propounded to him on cross-examination, denied each of these suggestions, except to admit that he had two bottles of beer, but, as stated supra, such cross-examination would not permit the testimony of the police officer to come in on the theory that he had made a prior consistent statement.

However, in appellant's case, testimony of an investigator retained by appellant's counsel to investigate the case and interview Mr. Woodard was introduced. Mr. Joseph A. Steinmetz, Jr., testified that he and his partner, a Mr. Jan Esterling, interviewed Mr. Woodard on October 11, 1971, at approximately 7:30 p. m., at Walter's Bar relative to the occurrence of May 26, 1971. He testified that he asked Mr. Woodard some questions and that Mr. Woodard answered them. According to Mr. Steinmetz' testimony Mr. Woodard at that time told him that on May 26, 1971, he had been at a funeral of his aunt in his home town and had arrived back in St. Louis at about 9 a. m. that day. That he then picked up six uniform shirts from the cleaners at 11th and Park Streets, and then went to Walter's Bar where he stayed and drank until approximately midnight, after which he drove to the intersection at 11th and Park Streets, where he parked his car, then laid down on the front seat and went to sleep. The next thing he remembered was that he was awakened suddenly and found a Negro male holding a knife to his throat. After the robbery he went into the Red Top Bar, across from the cleaners on Park Avenue. That "he could not recall anything distinctive about his assailants, such as their physical characteristics, their attire, their speech, or anything else."

With respect to the knife, " . . . he said the only thing he could remember about the knife is that it had, quote, some writing or an emblem on it." He did not recall the color of the handle, nor the length or shape of the blade. On cross-examination, Mr. Steinmetz stated that his testimony was by recollection from his notes, which he believed to be correct, and which were dictated promptly after his interview with Mr. Woodard. He further testified that Mr. Woodard told him that he had returned to St. Louis at 9 a. m. on May 26, 1971, and even though the assistant circuit attorney told him that the robbery occurred at 12:25 a. m. on May 26, 1971, this would not change his recollection of what Mr. Woodard had told him. He admitted that Mr. Woodard had not signed the statement of the interview and that no recording device was used to record the interview.

The thrust of this testimony was to prove that Mr. Woodard had been drinking throughout the day prior to the robbery and that he was so much under the influence of alcohol or so weary after he left Walter's Bar and drove to the corner of 11th and Park Streets that he, contrary to his own testimomy, laid down and went to sleep. That when he was awakened from a sound sleep he was, under the conditions then and there existing, incapable of forming an identification image of his robbers *at the scene of the robbery or observe the physical characteristics of the knife held against his throat.* This testimony of the investigator made no reference whatsoever to the post-arrest confrontation and what occurred there.

■ Had Officer Schulze been recalled as a rebuttal witness his testimony relative to what Mr. Woodard told him at the Red Top Tavern when he arrived there shortly after the robbery would have been admissible, but only with respect to the description of the knife as a prior consistent statement. We are not unaware of the conflicts in the testimony in this respect. Mr. Woodard's testimony was that the knife had a white handle, and that he told this to the police officers after they left the Red Top Tavern and were en route to the post-arrest confrontation. Officer Schulze testified that Mr. Woodard described the knife while they were still at the Red Top Bar, prior to setting out for the arrest scene, and that he described it "as a white pearl-handled knife and the blade was about four to five inches long;" These conflicts do not, however, affect the admissibility of the testimony but go only to the weight of the evidence. We conclude therefore that although it was error to admit the testimony of Officer Schulze during the State's case in chief, such error was not, when viewed in the light of the evidence offered by the appellant for the purpose of impeaching Mr. Woodard by a subsequent statement, prejudicial error which would require that this case be reversed and remanded, and we so hold.

■ We also conclude that the failure of counsel to interpose an objection to the testimony of Officer Schulze that Mr. Woodard identified the appellant and the other two men at the post-arrest confrontation as the same ones that held him up precludes us from considering this alleged trial error. We do not quarrel with the general principle espoused by appellant that once an objection is made which explicitly presents to the trial court the issue and the objection is overruled it is no longer essential that the party interposing the objection thereafter repeat the objection each time the other party seeks to elicit like testimony to preserve his record for review. We have determined though that the authorities cited for this principle are not controlling here. The quotation from Wooten v. Friedberg, 355 Mo. 756, 198 S.W.2d 1, 6 [4] (1946), while supporting the general statement concluded: "But no objection to the introduction of the judgment was *squarely* made." This, for reasons we shall more fully elucidate, is also true here. And in Chester v. Shockley, 304 S.W.2d 831, 835 [4, 5] (Mo.1957), the question

there concerned the testimony of a police officer relative to the point of impact of two cars involved in an auto collision. The officer was not an eyewitness and was permitted over objection to testify concerning his opinion as to the point of impact. Once the objection was made to this opinion evidence being admitted it could run to any testimony in this respect by this same officer during his testimony with respect to the expressed opinion. We also find that Snell v. Overfelt, 307 S.W.2d 716 (Mo.App.1957) and Hart v. Kansas City Public Service Co., 154 S.W.2d 600 (Mo. App.1941) are not controlling for similar reasons.

■ We distinguish these cases because in this case the objection was interposed to the question directed to the officer's testimony about what the victim of the robbery reported to him at the Red Top Tavern upon his arrival there. That objection was overruled and we have disposed of the errors alleged to the action of the court with respect thereto. The line of inquiry then moves on to what was done with Mr. Woodard after he had reported the robbery and gets into the evidence that he was taken from the scene of the robbery to the parking lot at St. Ange Court and Morrison Lane. It is at this point that the question and answer claimed to be error developed. No objection was made prior to the answer, nor was there any claim that the answer was made prior to the opportunity of counsel to interpose an objection. There is no doubt the testimony was objectionable and if requested the trial court should have taken some action if the matter were presented to it in proper posture, State v. Degraffenreid, supra, 477 S. W.2d 1. c. 64 [13], but we find that an objection to testimony made when it is sought to introduce the contents of the report of the robbery to the police officer at the scene of the crime cannot be transferred over to the testimony relative to what occurred at the scene of the arrest some few minutes later; and that under these circumstances the principle that

where the objection made explicitly presents the issue to the trial court, and is overruled that it is not necessary for the party interposing the objection to thereafter repeat the objection each time like testimony is sought to be elicited does not apply. To so hold would make it feasible to make objection to one form of evidence early in the case and then carry it over to a like form later on without affording the trial court an opportunity to consider the validity of the latter objection.

This contention is likewise ruled against the appellant.

Appellant's next contention is that the court erred in giving and reading to the jury Instruction No. 3, the burden of proof instruction. This Instruction has been approved time and time again, and we find no reason to hold it erroneous at this time. State v. Edwards, 435 S.W.2d 1, 7 [11] (Mo.1968); State v. Davis, 482 S.W.2d 486, 489 [9] (Mo.1972); State v. Everett, 448 S.W.2d 873, 878 (Mo.1970); State v. Garrett, 276 Mo. 302, 207 S.W. 784, 786 [1] (1918). This point is also ruled against the appellant.

■ Appellant's last contention is that the trial court's sentence is so severe and unconscionable as to constitute cruel and unusual punishment and to demonstrate bias and prejudice of the trial court. It is within the statutory limitations set by the Legislature of this State for the offense of which the appellant was convicted. Section 560.135. While Missouri courts have the power to reduce sentences under Rule 27.04, V.A.M.R., the standard to be applied is that passion and prejudice must so clearly appear from the record that the reviewing court can confidently say that the trial court imposing the sentence abused it discretion by declining to reduce the punishment. When the jury returned its verdict the judge assessed punishment at 25 years confinement in the Department of Corrections of the State of Missouri. However, after overruling appellant's motion for new trial, the appellant was grant-

ed allocution and the trial judge advised him that he had changed his mind and then sentenced appellant to confinement in the Department of Corrections for the period of 20 years. There is nothing in this record which would cause us to conclude that the sentence imposed was due to prejudice or bias on the part of the trial judge nor that the punishment imposed is cruel and unusual in the constitutional sense. For the aforesaid reasons we also rule this point against the appellant.

Having concluded that there was no error in overruling appellant's pre-trial motions to suppress the evidence of the knife seized from his pocket at the time of his arrest and the post-arrest identification, we further conclude that with all of the evidence before us, the post-arrest confrontation was not violative of appellant's constitutional rights. The evidence in this respect was, therefore properly admitted into evidence during the trial of the cause. It therefore follows that the evidence made a submissible case of the appellant's guilt and was properly submitted to the jury. It must be remembered that our appellate courts in a criminal prosecution do not weigh the evidence, but regard the substantial testimony and every reasonable inference therefrom favorable to the verdict of the jury as true. State v. Jones, 363 Mo. 998, 255 S.W.2d 801, 804 [2] (1953); State v. Bizzle, 500 S.W.2d 259 (Mo.App. handed down August 14, 1973). While it is obvious that this was a close case, we do find that the verdict of the jury was supported by substantial evidence, and the trial court did not err in denying appellant's motion for new trial and motion for judgment of acquittal, notwithstanding the verdict of the jury.

We have reviewed those parts of the record required by Rule 28.02 and find no error.

Judgment affirmed.

SMITH, P. J., and SIMEONE, J., concur.